[No. 1325. September 1, 1911.]

VICENTA MONTOYA, Plaintiff, v. UNKNOWN HEIRS OF FRANCISCO MONTES VIGIL, Deceased; THE UNKNOWN HEIRS OF JUAN GONZALES, Deceased, AND ALL UNKNOWN OWNERS OF THE REAL ESTATE HEREINAFTER DESCRIBED, Defendants, Appellants, CANDIDO G. GONZALES, et als., Intervenors, Appellees.

## SYLLABUS (BY THE COURT).

1. Under Section 3182, Compiled Laws 1897, the owner of the whole or any part of the premises sought to be partitioned may, whatever the origin of his title, intervene for the settlement of his rights.

2. A judgment in a partition suit which declares the rights of the parties and orders partition, is interlocutory only and is under the control of the court until final decision, and may be modified or rescinded at any time prior to final judgment or decree.

3. Section 2937, Compiled Laws of 1897, construed and held to grant affirmative relief in the nature of a fee simple or statutory title in addition to the bar of the statute, in favor of persons being in possession of tracts of land within the boundaries of Spanish or Mexican land grants, for ten years under a deed or deeds of conveyance, devise, grant or other assurance purporting to convey an estate in fee simple upon compliance with the terms of the section, and possession of any part of the tract thus conveyed extends to the exterior boundaries of the lands described in such conveyance.

4. That section 2937, supra, was enacted by the legislature as a statute of repose for the purpose of settling the titles and preserving the rights of the pioneer settlers who in good faith settled upon, improved and cultivated vacant lands of the Spanish and Mexican grants within the territory, the ownership of which was unknown.

5. Section 2938 does not purport to confer fee simple title as is provided for in section 2937, but simply raises

the bar of the statute against the bringing of actions for the possession of lands held adversely for ten years under color of title and with payment of taxes, and is inapplicable to the present case.

6. The doctrine of mixed possession as laid down in Hunnicutt v. Payton, 102 U. S. 333, examined and held to be inapplicable.

Appeal from the District Court for Bernalillo County, before IRA A. ABBOTT, Associate Justice. Affirmed in part and reversed and remanded as to remainder.

ALONZO B. McMILLEN for Appellants.

Claim of title on account of adverse possession. C. L. 1897, secs. 2937, 2938; Laws 1899, chap. 63, sec. 2; Laws 1905, chap. 76, sec. 1.

Possession in accordance with the legal title is presumed. Gonzales v. Ross, 120 U. S. 605; Chesapeake, etc. Ry. v. Washington, etc. Ry., 199 U. S. 247; Evans v. Welch, 68 Pac. 79, Cal.; 1 Washburn Real Property 63; Mining Co. v. Taylor, 100 U. S. 37; McClung v. Ross, 5 Wheat. 116; Barr v. Gratz, 4 Wheat. 213; Armijo v. Neher, 11 N. M. 645; Stevens v. Martin, 168 Mo. 407; Freeman Co-Tenancy and Partition, secs. 166, 167, and 222; 1 Washburn Real Property 689; Brownsville v. Cavazos, 100 U. S. 138; Deputron v. Young, 134 U. S. 241; Ward v. Cochran, 150 U. S. 597; Hunneycutt v. Peyton, 120 U. S. 333; Bracken v. U. P. R. Co., C. C. A., 75 Fed. 347.

The decree of partition was a final judgment. Baca v. Anaya, 14 N. M. 389; 1 Freeman on Judgments, secs. 304, 307; 30 Cyc. 253; Keil v. West, 21 Fla. 508; Irwin v. Buckels, 148 Ind. 389; Janes v. Brown, 48 Ia. 568; Traverso v. Row, 11 La. 498; Allen v. Hall, 50 Maine 253; Ham v. Ham, 39 Me. 216; Patridge v. Luce, 36 Me. 16; Slingluff v. Stanley, 66 Md. 220; Pfeltz v. Pfeltz, 1 Md. Ch. 455; Mt. Hope Iron Co. v. Dearden, 140 Mass. 430; Burghardt v. Van Deusen, 4 Allen 374; Brown v. Bulkley, 11 Cush. 168; Foster v. Jones, 17 Southern

893, Miss.; Hinds v. Stevens, 45 Mo. 209; Rockwell v.
Decker, 5 N. Y. Civ. Proc. 62; Grimes v. Taft, 98 N. C.
193; Clemens' Appeal, 8 Pa. Cases, 321; Johnson v.
Murray, 12 Lea 109; Petrucio v. Seardon, 76 Tex. 639.

Findings insufficient to support decree. Smith et al.
v. U. S., 2 Wall. 219; Laws 1899, chap. 63; Laws 1905,
chap. 76.

Where a statute requires payment of taxes as an
element of adverse possession, it is necessary for the ad-
verse claimant to show such payment of taxes during the
full period necessary to establish adverse possession.
Beaver v. Taylor, 1 Wall. 637; Warvelle on Ejectment,
sec. 342; Wettig v. Bowman, 47 Ill. 17; Power v. Kitch-
ing, 10 N. D. 254; Raynolds v. Willard, 80 Cal. 605;
Irwin v. Miller, 23 Ill. 401; Cofield v. Furry, 19 Ill. 183;
Snowden v. Rush, 76 Tex. 197; Harden v. Gouveneur,
69 Ill. 140.

In order to constitute adverse possession it must be
actual, visible, notorious, continuous, exclusive, hostile,
and under claim of right. Johnson v. Albuquerque, 12
N. M. 20; Gentile v. Kennedy, 8 N. M. 347-354; Probst
v. Trustees, 3 N. M. 373; Jenkins v. Maxwell Land Grant
Co., et al., 15 N. M. 281; Armstrong v. Morrill, 14 Wall.
120; Hogan v. Kurtz, 94 U. S. 773; Ward v. Cochran,
150 U. S. 597; Clarks' Lessee v. Courtney, 5 Pet. 319;
Barr v. Gratz, 4 Wheat. 223; Brownville v. Cavazos, 100
U. S. 138; Deputron v. Young, 134 U. S. 241; Bracken
v. Union Pacific Ry., C. C. A., 75 Fed. 347; Bergere v.
U. S., 168 U. S. 66; Whitney v. U. S., 167 U S. 529;
Gatling v Lane, 17 Neb. 77; McKeighan v. Hopkins,
14 Neb. 361; French v. Pearce, 8 Conn. 439; Sparrow
v. Hovey, 44 Mich. 63; Johnson v. Irwin, 3 S. & R.
291; Mercer v. Watson, 1 Watts 330; Overfield v. Christy,
7 S. & R. 173; Jackson v. Berner, 48 Ill. 203; Foulk v.
Bond, 12 Vroom 527, N. J.; Cook v. Babcock, 11 Cush.
206; Horback v. Miller, 4 Neb. 31; Parker v. Starr, 21
Neb. 680; Ballard v. Hansen, 33 Neb. 861.

GEORGE S. KLOCK and A. A. SEDILLO for Appellees.

Decree of partition was interlocutory and not final.

C. L. 1897, secs. 3197 to 3186; Laws 1907, chap. 107, sub-sec. 269; 30 Cyc. 252; Randels v. Randels, 63 Ind. 93; Aull v. Day, 133 Mo. 337; Warren v. Williams, 25 Mo. App. 22; Mingay v. Lackey, 142 N. Y. 449; Schweitzer's Estate, 4 Lans. L. Rev. 369, Pa.; Zittle's Estate, 4 Lans. L. Rev. 163, Pa.; 15 Enc. P. & P. 810; Hart v. Stedman, 98 Mo. 457; Halloway v. Halloway, 103 Mo. 284; 1 Black on Judgments, secs. 17, 39; 3 Black. Comm. 296; Green v. Fiske, 103 U. S. 518; Elder v. McClaskey, 17 C. C. A. 251; Gesell's Appeal, 84 Pa. 238; Beebe v. Griffing, 6 N. Y. 465; Temple v. Steptoe, 1 Munf. 339, Va.; Young v. Skipwith, 2 Wash. 300, Va.; Putman v. Lewis, 1 Fla. 465; Medford v. Harrell, 10 N. C. 41; Clester v. Gibson, 15 Ind. 10; Davis v. Davis, 36 Ind. 160; Curran v. Maginnis, 41 Ind. 398; Pipkin v. Allen, 49 Mo. 229; Durham v. Darby, 34 Mo. 447; Ivory v. Delore, 26 Mo. 505; Gates v. Salmon, 28 Cal. 320; Peck v. Vanderberg, 30 Cal. 11; Mills v. Miller, 2 Neb. 299; Murray v. Yates, 73 Mo. 13; Knapp on Partition 202; Emeric v. Alvarado, 64 Cal. 529; Booth Real Action 234; Daniel's Chancery Practice 2254; Ham v. Ham, 34 Me. 218; Robinson v. Glancey, 69 Pa. St. 89; Clarke v. Baird, 98 Cal. 642; Tompkins v. Hyatt, et al., 19 N. Y. 534; McKeen v. Officer, 127 N. Y. 687; 30 Cyc. 301; Baca v. Anaya, 14 N. M. 382.

Findings of fact warranted the decree. C. L. 1897, secs. 2937, 2938; Laws 1899, chap. 63, secs. 1, 2; Laws 1905, chap. 76; Tyler on Ejectment and Adverse Enjoyment 88, 872, 873; Wright v. Mattison, 18 How. 50, U. S.; Lea v. Polk County Copper Co., 21 How. 493; Wales v. Smith, 19 Ga. 8; Dickinson v. Breedon, 30 Ill. 279; Hanna v. Renfro, 32 Miss. 125; Bradstreet v. Huntington, 5 Pet. 402, U. S.; Ewing v. Burnett, 11 Peters 51; 3 Rose's Notes 637; Strothers v. Lucas, 12 Pet. 437; Ellicott v. Pearl, 10 Pet. 413.

Adverse possession. 1 Enc. of Ev. 685; Foulke v. Bond, 4 N. J. Law 527; Elder v. McClaskey, 70 Fed. 529; Packard v. Johnson, 57 Cal. 180; Dugan v. Follett, 100 Ill. 581; Sullivan v. Holmes, 8 Cush. 252; Enc. of Ev. 690; Berry v. Seawell, 65 Fed. 742; Allen v. Sea-

well, 70 Fed. 561; Campbell v. Bates, 39 So. Rep. 144, Ala.; Connerly v. Dickinson, 99 S. W. 82, Ark.; Rucker v. Dickson, 93 S. W. Rep. 750, Ark.; George v. Cole, 33 So. Rep. 784, La.; Santee River Co. v. James, S. C., 50 Fed. Rep. 360; Peden v. Crenshaw, C. C. A., Tex., 81 S. W. 369; Robertson v. Dowing Co., 120 Ga. 833; O'Brien v. Fletcher, 51 S. E. 405, Ga.; Van Gunden v. Virginia Coal & Iron Co., 52 Fed. 838; Bracket v. Person Unknown, 53 Me. 228; Green v. Irving, 54 Miss. 450; Little v. Downing, 37 N. H. 355; Black v. Tennessee Coal, Iron and R. R. Co., 93 Ala. 109; Waters v. Connelly, 59 Iowa 217; Taliaferro v. Butler, 77 Tex. 578; Hodges v. Ross, 6 Tex. Civ. App. 437; Brown v. O'Brien, 33 S. W. 267; Tex., Swift v. Gage, 26 Vt. 224; C. L. 1897, sec. 2937; 25 Cyc. 1449; Gay v. Parpart, 100 U. S. 27.

An unregistered deed is sufficient to constitute the bar of the Statute of Limitations. Lea v. Polk County Copper Co., 21 How. 493, U. S.; Packard v. Moss, 68 Cal. 128; Chastain v. Phillips, 11 Ired. 255; Hardin v. Barrett, 6 Jones 159; Krow v. Hinson, 8 Jones 347; Rawson v. Fox, 65 Ill. 200; Minot v. Brooks, 16 N. H. 374; Dickinson v. Greedon, 30 Ill. 279; Wooley v. Constant, 5 Johns. 54, N. Y.; 2 Cyc. 172, 173; Smith, et al. v. U. S., 2 Wall. 219; Chessman v. Whittemore, 23 Picker. 231; 13 Cyc. 721.

### STATEMENT OF FACTS.

This action was brought for the partition of the entire Alameda Land Grant, situated in the counties of Bernalillo and Sandoval. The complaint was filed on the 12th day of June, 1906, and the defendants in the suit were designated as follows: "The unknown heirs of Francisco Montes Vigil, deceased; the Unknown Heirs of Juan Gonzales, deceased, and all Unknown Owners of the real estate hereinafter described," and the Grant is described as follows: "A tract of land known as 'The Alameda Land Grant,' bounded on the north by the ruins of an old pueblo, on the south a small hill which was the boundary of Luis Garcia, on the east by the Rio del Norte as it ran in the year 1710 near the eastern foothills,

and on the west a prairie and hills, and containing, according to the official survey thereof, 89,346 acres of land, as will more fully appear from the record of said survey on file in the office of the Surveyor General of New Mexico, reference to which is made for more particular description." The complaint further alleges that the grant was made by authority of the King of Spain to Francisco Montes Vigil in consideration of military services rendered on the 2nd day of January, 1710, juridical possession being given on January 27th, 1710. That Vigil sold and conveyed the grant to Captain Juan Gonzales on the 18th day of July, 1712, the conveyance being approved by the governor and captain general on the 18th day of September, 1713. The complaint further alleges that the grant was afterwards confirmed by the Court of Private Land Claims to the heirs, assigns and legal representatives of Francisco Montes Vigil and Juan Gonzales, and, "That the plaintiff, together with the defendants other than the unknown heirs of Francisco Montes Vigil, deceased, are the owners and possess as tenants in common the tract of land known as the Alameda Land Grant." The complaint further alleges that the unknown heirs of Vigil claim some right, title or interest in the said lands, but denies the claim, alleging that Vigil sold and conveyed all his right, title and interest therein to Captain Juan Gonzales." Plaintiff further alleges: "That a portion of said tract of land in the Rio Grande Valley lying east of the foothills and below the irrigating ditches is occupied by various persons and claimed in severalty by reason of original allotments or by adverse possession, the amount of which said land so occupied and the names of the persons claiming to own said lands in severalty and the description of the land so occupied are to plaintiff unknown. "That all of the lands lying west of the irrigating ditches and foothills, and also a portion of the lands lying east of said irrigating ditches and foothills in the Rio Grande Valley, are held and occupied by said plaintiff and the defendants other than the unknown heirs of Francisco Montes Vigil, as tenants in common." The judgment prayed for is that the defendants be re-

quired to set up or prove their respective interests in the premises or be forever barred; that partition be granted according to the rights of the several parties, and if material injury would result from partition, that the premises be sold and the proceeds divided as the rights of the respective parties may require.

The service made was by publication of notice by the clerk of the District Court and first proof of publication was filed on the 6th day of August, 1906. As there is some question as to the sufficiency of this proof of publication, it will be set out in full, as follows:

### "AFFIDAVIT OF PUBLICATION.

"Territory of New Mexico,
  "County of Bernalillo.—ss.

"W. T. McCreight, being duly sworn, declares and says that he is business manager of the Albuquerque Weekly Citizen, a newspaper published and having a general circulation in the City of Albuquerque and County of Bernalillo and Territory of New Mexico; that the publication, a copy of which is hereto attached, was published in said paper, in the regular and entire issue of every number of the paper during the period and time of publication, and that the notice was published in the newspaper proper and not in a supplement, for four times, consecutively, the first publication being on the 23rd day of June, 1906, and the last publication on the 14th day of July, 1906.

"(Signed) W. T. McCREIGHT,
                "Business Manager."

On the 21st day of September, 1907, another proof of publication was filed, as follows:

### "PROOF OF PUBLICATION.

"Territory of New Mexico,
  "County of Bernalillo.—ss.

"William F. Brogan, being by me first duly sworn, deposes and says that he is the business manager and also the editor of the Albuquerque Weekly Citizen; that said

Albuquerque Weekly Citizen was at the times hereinafter mentioned and now is published in the City of Albuquerque, County of Bernalillo aforesaid, and had and now has a general circulation in said city and county, and Territory of New Mexico. That the notice of suit in the above cause, a copy of which is attached to a proof of publication filed in said cause on the 6th day of August, 1906, was printed and published in said Albuquerque Weekly Citizen once a week for four consecutive weeks; and that said notice was so printed and published in said Albuquerque Weekly Citizen on the 23rd day of June, 1906, and the 30th day of June, 1906, and the 7th day of July, 1906, and the 14th day of July, 1906; that said publications of June 23rd, 1906, June 30th, 1906, July 7th, 1906, and July 14th, 1906, were in regular issues of said Albuquerque Weekly Citizen, and all the issues of said Albuquerque Weekly Citizen from the 23rd day of June, 1906, to the 14th day of July, 1906, both dates inclusive.

WM. F. BROGAN.

"Subscribed and sworn to before me, a notary public within and for said county of Bernalillo, by William F. Brogan, this 20th day of September, 1907.

"(Notarial Seal)              ADELA C. HOLMQUIST,

"Notary Public."

On the 9th day of August, 1906, and prior in time to the filing of the second proof of publication, the following order was entered: "This day this cause came on to be heard upon the complaint, proof of publication and certificate of default and was submitted to the court for approval of publication. Whereupon the court, being fully advised in the premises finds that said publication of notice to said defendants was in all respects regular and in accordance with law, and that said defendants and each of them were duly served by publication of notice and are in default for want of appearance within the time provided in said notice. It is therefore ordered, adjudged and decreed that the service of notice by publication and said publication of notice be, and the same hereby is, approved. It is further ordered, adjudged and decreed that the

said complaint be, and the same hereby is, taken as con-fessed by said defendants." And the order then provides for the appointment of Harry P. Owen, referee, to take proofs and report the same to the Court, together with his findings of fact and conclusions of law.

March 16th, 1907, the following answer was filed: "Come now the defendants, Bonifacio Montoya, Candela-rio Montoya de Castillo, Adelberto C. de Baca, Francisco Montoya, Victoriana Montoya, Juan Antonio Rodarte, Rosa Maldonado, Abelino Maldonado, Manuel Gonzales, Nestora Gonzales de Sanchez, Leopoldo Sanchez, Felicita Sanchez, Sofia Sanchez, Raymunda Sanchez de Gonzales, Alfredo Gonzales, Erlinda Gonzales, Araigapita Gonzales, Aurelia L. de Gonzales, Leopoldo Gonzales, Florencio Gonzales, Esoyla Gonzales, Prospero Gonzales, Epamim-ondo Gonzales, Aurora R. Gonzales, Maria Sanchez de Martinez, Melquiades Martinez, Felix Tafoya Gonzales, Pedro Sanchez, Merced Gonzales, Fabiana Gonzales, Dolores Griego de Cordova, and for answer to plaintiff's complaint, says that each of them claims an interest in the real estate described in said complaint and joins in the prayer of said complaint for partition of said real estate. (Signed) A. B. McMillen, Attorney for Defendants."

On the following day, March 17th, 1907, a judgment in partition was rendered, confirming the report of the Referee, subject to the rights of certain persons as therein specified, and partitioning the premises among some four hundred and fifty persons whose fractional interests are therein set out, if the same can be partitioned without injury, etc. The decree does not extend to the entire Alameda Grant, but only extends to such portion thereof as is described as follows: "Territory of New Mexico, being a tract of land known as the Alameda Land Grant, bounded on the north by the ruins of an old pueblo; on the south by a small hill which was the boundary of Luis Garcia; on the east by the Rio del Norte as it ran in the year 1710 near the eastern foothills, and on the west a prairie and the hills, and containing, according to the official survey thereof, eighty-nine thousand three hundred and forty-six acres of land as will more fully appear

from the record of said survey on file in the office of the Surveyor General of New Mexico. And the court further finds that the lands so partitioned are subject to the rights of claimants in severalty in that portion of the Alameda Land Grant in the Rio Grande Valley lying east of the foothills and below the irrigating ditches, in accordance with the exception in plaintiff's complaint; and that said claims in severalty are not determined in this proceeding."

The decree awards to Mr. A. B. McMillen a fractional interest of 26857-60480 in the lands partitioned, for legal services rendered and by purchase. On the 5th day of July, 1907, commissioners were appointed to make partition of the lands, but they reported that, "Owing to the nature of the land, most of which is fit only for grazing purposes, and owing to the large number of owners, there being more than five hundred, and to the fact that the interests in many instances are very small, that partition of said premises cannot be made consistently with the interests of the estate or the rights of the persons found to own interests therein, and that a division thereof would be manifestly prejudicial to the owners thereof."

At this point in the progress of the case, and before any sale of the lands had been ordered or had taken place, on the 20th day of July, 1907, George S. Klock and A. A. Sedillo entered a special appearance, and, on behalf of a large number of persons, claimants of interests in severalty, filed a motion for leave to intervene in said cause and for leave to answer the plaintiff's complaint in the main case. In pursuance of this motion the Court made the following order: "It appearing to the court that the persons who filed a special appearance in this action, by motion, on the 20th day of July, 1907, claim to be interested in the premises described in the complaint herein, and it further appearing that this suit and proceeding is still pending: It is hereby ordered that each and all of said persons so appearing by special motion in this action filed in this cause on July 20th, 1907, as aforesaid, be and they hereby are allowed to appear and answer the complaint of the plaintiff in this action

by way of intervention, and that said persons may assert any right, with the same force and effect as though said persons had been made parties in the first instance in this action, to which order plaintiffs excepted. It is further ordered that each and all of said persons so allowed to answer by way of intervention, as aforesaid, be and they hereby are allowed twenty days within which to file their said answer. Done in court this 20th day of November, 1907."

On the 29th day of November, 1907, counsel for some ninety or more intervenors filed a voluminous answer, denying all of the relief prayed for by the plaintiff and the defendants answering in the main case, and setting forth affirmatively the rights of the intervenors. This intervention and answer so clearly states the case relied on by the intervenors, that it will be set out in full here, beginning with paragraph 4. "4. Defendants admit that a portion of said tract of land in the Rio Grande Valley lying east of the foothills and below the irrigation ditches is occupied by various persons and claimed in severalty; but they deny that they claim the same in severalty by reason of original allotments or by adverse possession only, and allege that they also claim the same in severalty, because they have owned and held the same by themselves and their predecessors in title for more than fifty years last past, holding and claiming the same under and by virtue of deeds of conveyance, devise, grant and other assurances purporting to convey an estate in fee simple, and that no claim by suit in law or equity effectually prosecuted has been set out or made to said lands and separate holdings within the aforesaid time of more than fifty years. And defendants deny that all or any of the land lying west of the irrigating ditches and foothills or a portion of the land lying east of said irrigation ditches and foothills in the Rio Grande Valley, or that any lands whatsoever of the tract of land known as the Alaméda Grant and involved in this action, are held and occupied by the plaintiff and the defendants other than the unknown heirs of Francisco Montes Vigil, or by any other person or persons whatsoever, as tenants in common. 5.

Defendants deny each and every allegation contained in paragraph 7 of plaintiff's complaint.   6. And by way of defense, these defendants allege: That they are the owners in severalty and in possession respectively of diverse tracts of lands situate within the boundaries of the tract of land described in plaintiff's complaint, and that they and diverse other persons are the owners in severalty and in possession of diverse tracts of land situate within the boundaries of the tract described in said complaint, which said diverse tracts of land so owned and held in severalty constitute all of the tract of land known as the Alameda Grant and described in plaintiff's complaint; that they and their predecessors in title have had possession thereof respectively for more than fifty years last past, holding and claiming the same by virtue of deeds of conveyance, devise, grant and other assurances purporting to convey an estate in fee simple, and that no claim by suit, in law or equity, effectually prosecuted has been set out or made to said lands within the aforesaid time of more than fifty years.   7. That they are the owners in severalty and in possession, respectively, of diverse tracts of lands situate within the boundaries of the tract of land described in plaintiff's complaint, and that they and their predecessors in title have had possession of each of said tracts of land respectively, for more than fifty years last past, holding and claiming the same by virtue of deeds of conveyance, devise, grant and other assurances purporting to convey an estate in fee simple, and that no claim by suit, in law or equity, effectually prosecuted has been set out or made to said lands within the aforesaid time of more than fifty years. 8. These defendants further allege that portions of the lands lying west of the irrigating ditches are not susceptible of irrigation and are only valuable and can only be used for grazing purposes; that the tracts of land owned and held in severalty as herein alleged, embrace the lands lying west of the irrigating ditches, and also the lands lying east of said irrigating ditches, portions of which are also not susceptible of irrigation and are only valuable and can only be used for grazing purposes; that portions of said lands lying east and west of the irrigating ditches

are susceptible of irrigation, that they are parts of the same lands and are embraced and described as such in the assurances of title aforesaid; that these defendants and their predecessors in title and the other diverse persons and their predecessors in title have been in the open, actual, hostile, exclusive and continuous possession of each and all tracts of land owned and held by them in severalty as aforesaid, and that all of the tract of land known as the Alameda Land Grant, and described in plaintiff's complaint, has been so owned and held for more than fifty years last past; that during all said period of time these defendants and their predecessors in title and the said diverse other persons and their predecessors in title, respectively, have occupied, cultivated and improved those portions of said lands susceptible of irrigation, cultivation and improvement and have used the remainder thereof for grazing purposes, and claiming to own the whole of their individual possessions and holdings and the whole thereof, by virtue of deeds of conveyance, devise, grant and other assurances purporting to convey an estate in fee simple to each and all of said lands respectively. 9. Defendants further allege that each and all of the lands owned and held in severalty by them as aforesaid, respectively, are so owned and held by them in fee simple, and that the said plaintiff and any and all other persons whatsoever have no right, title or interest therein, either as tenants in common or in any other manner whatsoever. 10. Defendants further allege that the plaintiff, Vicenta Montoya, was the owner of a certain tract of land thirty-four varas wide from north to south and in length extending from about three hundred yards east of Corrales lower ditch to the west boundary line of the said Alameda Grant, bounded on the north by lands of Rafaéla Gutierrez de Gonzales, on the south by lands of the heirs of M. S. Otero, deceased, on the east by lands of E. M. Sandoval, and on the west by the west boundary line of said Alameda Grant, which said tract of land she inherited from one Jose Antonio Montoya, her grandfather, and that she owned and held the same in severalty; that on the — day of March, 1907, she con-

veyed the same to one Abenicio Perea in fee simple; and
these defendants allege that the said tract of land was and
is the only land that plaintiff owned in said grant, and
that plaintiff had never had any other interest, either in
common or otherwise, in any lands in said grant, and
these defendants allege that plaintiff is not an interested
party in this action.   Wherefore, these defendants pray
that the prayer in plaintiff's complaint be denied; that
the title of defendants to any and all lands owned by
them in severalty or otherwise be declared and estab-
lished and duly and forever quieted, and they be hence
dismissed with their costs in this behalf expended."

Candido G. Gonzales, another intervenor, filed a
separate answer setting up his claims, which were in all
respects similar to the above answer except that Gon-
zales claimed several tracts of land.   Counsel for the
plaintiff, and the defendants, represented by A. B. Mc-
Millen in the original cause, filed answers to the above
petitions of the interveners, simply denying each and
every allegation thereof, and Alonzo B. McMillen answered
alleging ownership by him of the lands awarded him by
the judgment in partition, and joins in the prayer for
partition.   By a stipulation in writing signed by the at-
torneys for all the parties, numerous other claimants in
severalty were authorized to appear as original interveners.
The cause being submitted to the court for decision on the
pleadings, oral and documentary, proofs and arguments of
counsel for the respective parties, the Court rendered a de-
cision in favor of the interveners and against the plaintiff,
as well as the defendant. On the 4th day of January, 1910,
the Court entered final judgment in favor of the inter-
veners, awarding to each of them certain tract or tracts of
the land, describing each tract by the number of varas
in width and running the entire length of the premises
from east to west, declaring the owner of each tract and
including in the judgment voluminous findings of fact.
The judgment concludes as follows: "It is therefore or-
dered, adjudged and decreed that the  said intervenors
above mentioned are entitled to hold the tracts of land set
off to them in the foregoing decree in severalty, free from

all claim or claims of the plaintiff in this action and her co-tenants or their successors or assigns. And the said plaintiff, her co-tenants and their successors or assigns are enjoined and forever barred from claiming any right, title or interest in or to any of the said lands above described, whether under the decree of partition heretofore entered in this cause or otherwise. It is further ordered, adjudged and decreed that the said intervenors recover from the said plaintiff their costs herein, to be taxed."

McMillen and other defendants who united with the plaintiff in the original cause, and confirmed the report filed by the commissioners to the effect that the lands could not be partitioned. A formal judgment was entered, a portion of which is as follows: "And the court having announced its decision in the intervention proceeding of Candido G. Gonzales and other interveners represented by George S. Klock and A. A. Sedillo and of the intervener Jacobo Yrisarri, favorable to the respective intervenors, but the decree fixing the rights of said interveners not having been entered of record, and it appearing advisable that the respective decrees in favor of interveners should be separately entered. It is ordered, that the order of sale herein, and the sale to be made in pursuance thereof, shall be subject to the rights of said interveners, respectively, as established by such order, judgment and decree as shall be finally made in favor of said interveners, respectively, either in this court or in any proper appellate court on appeal; and it is further ordered that said sale be made subject to the exceptions and reservations heretofore made in the decree of partition, and subject to the rights of George Hill Howard in and to the lands set forth in his intervening petition heretofore filed in this cause, in accordance with the written stipulation on file in this cause. And this cause coming on to be further heard upon the report of said commissioners, the court being fully advised in the premises, doth order, adjudge and decree that the premises hereinafter described be sold at public auction, at the front door of the County Court House of Bernalillo County, to the highest and best bidder for cash; subject, however, to the exceptions, conditions and reservations

hereinbefore mentioned; which said premises are situate in the counties of Bernalillo and Sandoval, Territory of New Mexico, and described as follows, to wit: A tract of land known as the Alameda Land Grant, bounded on the north by the ruins of an old pueblo; on the south by a small hill, which was the boundary of Luis Garcia; on the east the Rio del Norte, as it ran in the year 1710, near the eastern foothills, and on the west a prairie and the hills, and containing, according to the official survey thereof, 89,346 acres of land, as will more fully appear from the record of said survey on file in the office of the Surveyor General of New Mexico, reference to which is made for more particular description." Exceptions were properly saved to the findings and judgment of the court below and the cause was brought to this court by an appeal prayed for and granted to the plaintiff and defendants, to whom interests were awarded by the judgment in the original partition proceeding.

## OPINION OF THE COURT.

M'FIE, J.—It appears from the elaborate statement of the proceedings, that the plaintiff in the court below filed a complaint seeking the partition of a portion of the Alameda Land Grant, situated in both Bernalillo and Sandoval counties. There were no individual defendants when the cause was instituted, but the defendants were denominated, "Unknown heirs and unknown owners," claiming interests in that grant. The only service had was by publication. After publication for service had been made numerous individuals represented by plaintiff's counsel, Mr. A. B. McMillen, and Mr. McMillen a claimant of a large amount of the lands by purchase or otherwise, appeared as defendants, but confessing the allegations of the complaint and alleging heirship, they joined the plaintiff in the prayer for partition. Judgment by default was taken and Harry P. Owen was appointed referee to take proofs and genealogy, and report to the court. Testimony was taken before Mr. Owen, conducted by Mr. McMillen, attorney for the plaintiff and the defendants for whom he appeared, and the referee reported a genealogy and a state-

ment of the respective undivided interests of some four hundred and fifty or more persons found by him to be heirs and owners of interests in the Alameda Grant. This report was confirmed and a judgment rendered by the court declaring those persons entitled to undivided interests as stated in the Referee's report. In the last clause of the judgment three commissioners were appointed to make partition of the lands among the respective parties, and, if partition cannot be made without manifest prejudice to the interest of the parties, that the commissioners shall so report. The judgment was filed June 17th, 1907, but, while the commissioners made a report on the 5th day of July, 1907, that the premises could not be partitioned without manifest prejudice, the report was not confirmed and a sale ordered until March 11th, 1909, nearly two years after the preliminatry judgment in partition was rendered. As will be seen by the statement of the case, the application for leave to intervene was made July 20th, 1907, and the order allowing intervention was granted November 20th, 1907. Between the time of the entry of the judgment in partition, July 5th, 1907, and the order confirming the Commissioners' report and for sale of the premises, March 11th, 1909, the issues being joined between the parties and the rights of the respective parties, both as to the partition and intervention,—the same being practically consolidated,—were fully litigated and a final decree was rendered in favor of the interveners declaring them to be the owners of the lands claimed by them, and defining the amount to which each of the interveners are entitled, the terms of the final decree being set forth in the statement of the case.

The first assignment of error is upon the order of the court allowing intervention. In the decision of this cause it should be understood that it is conceded by all of the parties to the litigation that the Alameda Grant is a perfect grant and was so declared by the Court of Private Land Claims in 1892. This litigation, therefore, does not involve a contest between the sovereign and individual heirs or claimants, but is a contest between individual claimants who assert ownership of interests in the land of

the grant, as heirs, assigns, purchasers, long continued possession and use by those claiming under deeds, conveyances, devise; grant or other assurances purporting to convey an estate in fee simple, in which the sovereign has no interest. Counsel for appellants, both in oral argument and by brief, deny the right of intervention, insisting that a final decree had been rendered in their favor in the partition suit awarding them the land; that the decree was binding as against all adverse claimants and effectually barred any right of intervention to assert rights of ownership in the lands in litigation. Under the partition statute of this territory intervention is specifically provided for in section 3182, Compiled Laws 1897, as follows: "During the pendency of any such suit or proceeding any person claiming to be interested in the premises may appear and answer the petition and assert his right by way of interpleader, and the court shall decide upon their rights as though they had been made parties in the first instance." It will be observed that persons claiming to be interested in the premises may intervene during the pendency of a suit or proceeding having for its object the partition of lands. No limitation as to the time of intervention is prescribed, except that it must be during the pendency of the suit. In the order of the court allowing the claimants to intervene, it is stated that the suit was still pending at the time the order was made, and, being so, it was the duty of the court to grant the application; there was no discretion to grant or refuse the right, as it was a statutory right during the pendency of the proceeding. Baca v. Anaya, 14 N. M. 382.

It thus appearing that the intervention was in apt time, the next inquiry is whether or not the first decree in the partition proceeding was final, and deprived the interveners of any claim or interest in the lands involved, for the settlement of which a right of intervention existed. The interveners in this case, claim the ownership of the lands sought to be partitioned in the original suit. If they are the owners of the land the partition proceeding, if unopposed, would effectually deprive them of that ownership. In fact, that, in substance, is the contention of ap-

pellants' counsel; that the preliminary decree already rendered had the effect of quieting the title to the lands claimed by both parties, in appellants. Such is the logical result of the contention, that no right of intervention exists because of the rendition of the preliminary decree. That title to real estate claimed by different parties may be determined in a partition suit, and that intervention is a proper proceeding by which to accomplish this result, was settled by this court in Baca v. Anaya, supra, in which case, the court, after reviewing numerous decisions of other courts, said: "We concur with all that is said by these courts, and hold that under our statute the owner of the whole or any part of the premises sought to be partitioned may, whatever the origin of his title, intervene for the settlement of his rights." In this jurisdiction, and under our statute, it cannot be successfully maintained that the default decree or judgment, as it is called, is a final decree having any such effect as is contended for. Partition proceedings in a large number of states in which statutes are similar to our own, are peculiar in that two decrees are necessary to a final vesting of title to the lands in individual ownership. In such jurisdictions the first decree declaring the interests of the parties in the lands sought to be partitioned and appointing commissioners, is designated preliminary or interlocutory. Many of our statutes are practically the same as those of the state of Missouri, and seem to have been taken therefrom for the purpose of making our procedure similar to the settled and adjudicated procedure of that state. The decisions of that state, therefore, are of value to us in partition suits, as the procedure is similar to our own. In Aull v. Day, 133 Mo. 337, after citing numerous cases to the same effect, the court said: "A judgment in a partition suit which declares the rights of the parties and orders partition is interlocutory only, and is under the control of the court until the final decision of the suit, and may be modified or rescinded at any time before final judgment, even after the expiration of the term at which it was rendered." And the Court further said in that case, that even in a case where the answer admitted the allega-

tions of the petition, the judgment would still be interlocu-
tory only. In the State of New York the procedure under
the Code is of the same nature. In Mingay v. Lackey,
142 N. Y. 49, the Court said: "The judgment of April
8, 1893, was interlocutory and not final. It declared the
then existing rights and interests of the parties to the
litigation in the land. But it divested no title. It direc-
ted a reference for sale, for inquiry, for computation, and
for accounting. It provided for a distribution of the
proceeds of the sale based upon the several interests in the
land which should be included in the sale. But the sale
would become binding only upon confirmation by the court,
and until confirmation the purchaser would not be re-
quired to pay the purchase money, and until the pur-
chase money was paid or secured there would be no fund
for distribution. The practice in partition proceedings of
entering in the first instance an interlocutory judgment,
to be followed by a final judgment upon the termination of
the proceedings authorized by the interlocutory judgment,
prevailed in chancery and is expressly authorized and re-
quired by the Code." It seems wholly unnecessary to mul-
tiply citations in support of this view, but a reference to
Section 3138, Compiled Laws 1897, authorizes a simi-
lar preliminary judgment. The next section, however,
clearly indicates the necessity and grants authority for a
final judgment, and the record shows the rendition of a
final judgment by the court. We have examined the
authorities referred to in appellants' brief as to this point,
but find that they do not sustain the contention of coun-
sel, with one or two exceptions, but the diverging cases
are from states where by statute or code a different pro-
cedure is provided for. Take, for instance, the case of
Petrucio v. Seardon, 76 Tex. 639. This case is in line
with counsel's contention, but the state of Texas has a
different procedure. "In two states the power of the
court to make partition directly and without the aid of
commissioners has been affirmed, and in another that the
court may direct the mode of partition. These decisions
stand alone. The general rule is to the contrary." Cyc.
vol. 30, p. 250. The three states above referred to are

Texas, Tennessee and Louisiana. The judgment relied upon by appellants was interlocutory, and, as the record shows that no final judgment or decree was ever rendered in favor of the appellants, but, on the contrary, the final decree was in favor of the appellees, the interveners, hence no error was committed by the court in allowing the intervention, notwithstanding the interlocutory decree.

The remaining seven assignments of error all go to the merits of the case, each of them challenging the correctness of the final decree rendered by the court in favor of the intervening appellees and against the appellants. That a clear understanding of the scope of the present controversy as presented in the lower court and also by the record on this appeal, may be had, it must be kept in mind that the Alameda Grant includes some 89,346 acres of land; that a considerable portion of these lands are situated in the Rio Grande Valley above the City of Albuquerque, and a large part of the valley lands are, and for a great many years have been, occupied, improved and cultivated. These occupied lands lie between the Rio Grande and the foothills on the west side of the valley. These lands are divided in strips, some of which are inclosed and some are not. As to these strips of occupied and cultivated land, the original petition contains the following allegation: "Plaintiff further alleges that a portion of said tract of land in the Rio Grande Valley lying east of the foothills and below the irrigating ditches is occupied by various persons and claimed in severalty by reason of original allotments or by adverse possession, the amount of which said land so occupied and the names of the persons claiming to own said lands in severalty and the description of the land so occupied are to plaintiff unknown. Plaintiff further asks that partition hereinafter prayed for be made subject to the rights of said occupants in severalty." The interveners in their interpleader and answer as to these same strips of land allege: "That they are the owners in severalty and in possession, respectively, of diverse tracts of land situate within the boundaries of the tract of land described in plaintiff's complaint, and that they and their predecessors in title have had posses-

sion of each of said tracts of land, respectively, for more than fifty years last past, holding and claiming the same by virtue of deeds of conveyance, devise, grant and other assurances purporting to convey an estate in fee simple, and that no claim by suit, in law or equity, effectually prosecuted, has been set out or made to said lands within the aforesaid time of more than fifty years." The lands sought to be partitioned by all of the parties is a large body of uncultivated and unimproved grazing land extending from the ditches on the west side of the cultivated lands to the western boundary of the grant. As to this land, the petition for partition alleges: "That all of the lands lying west of the irrigating ditches and foothills, and also a portion of the lands lying east of said irrigating ditches and foothills in the Rio Grande Valley, are held and occupied by said plaintiff and the defendants other than the unknown heirs of Francisco Montes Vigil, as tenants in common." While the interveners make the following allegations: "These defendants further allege that portions of the lands lying west of the irrigating ditches are not susceptible of irrigation and are only valuable and can only be used for grazing purposes; that the tracts of land owned and held in severalty as herein alleged, embrace the lands lying west of the irrigating ditches, and also the lands lying east of said irrigating ditches, portions of which are also not susceptible of irrigation and are only valuable and can only be used for grazing purposes; that portions of said lands lying east and west of the irrigating ditches are susceptible of irrigation, that they are parts of the same lands and are embraced and described as such in the assurances of title aforesaid; that these defendants and their predecessors in title and the other diverse persons and their predecessors in title have been in the open, actual, hostile, exclusive and continuous possession of each and all tracts of land owned and held by them in severalty as aforesaid, and that all of the tract of land known as the Alameda Land Grant and described in plaintiff's complaint, has been so owned and held for more than fifty years last past; that during all said period of time these defendants and their predecessors in title

and the said diverse other persons and their predecessors in title, respectively, have occupied, cultivated and improved those portions of said lands susceptible of irrigation, cultivation and improvement and have used the remainder thereof for grazing purposes, and claiming to own the whole of their individual possessions and holdings and the whole thereof, by virtue of deeds of conveyance, devise, grant and other assurances purporting to convey an estate in fee simple to each and all of said lands respectively."

. From these allegations it is apparent that both parties claim the ownership of those mesa or grazing lands, the appellants as the heirs of Captain Juan Gonzales, and the appellees by fee simple title under "conveyances, devise, grant and other assurances purporting to convey an estate in fee simple," as provided for in Section 2937, Compiled Laws 1897. At the conclusion of the trial of the cause the same was submitted upon the pleadings, proofs and arguments of counsel for the respective parties, the court rendered a final decree with voluminous findings of fact, a separate decree in favor of each of the interveners, and a general decree in favor of all the interveners and against the parties to the original cause, and appearing by way of intervention, in terms as follows: "It is therefore ordered, adjudged and decreed that the said interveners above mentioned are entitled to hold the tracts of land set off to them in the foregoing decree· in severalty, free from all claim or claims of the plaintiff in this action and her cotenants or their successors or assigns. And the said plaintiff, her co-tenants and their successors or assigns are enjoined and forever barred from claiming any right, title or interest in or to any of the said lands above described, whether under the decree of partition heretofore entered in this cause or otherwise." Exceptions were properly saved by appellants' counsel to this decree. There being 86 findings of fact, a few of which are general, substantially applying to all, while the remaining findings apply to each of the claims of the interveners, it is impractical to set them out in full in this opinion, but it will suffice to set out in full one or two of the general findings,

and one of the findings as to the separate tracts, as all of those are substantially the same. "Finding No. 1. The interveners claim strips of land within the Alameda Grant very narrow in proportion to their length, most of them being only a few yards in width, each, and extending from the Rio Grande west to the ceja, or ridge, dividing the watershed of the Rio Grande from that of the Rio Puerco, and forming the western boundary of the grant, a distance of about sixteen miles. Most of them include land between the Rio Grande and the foothills at the west of the valley, which is adapted to cultivation, and the land exending from the foothills to the ceja of the Rio Puerco, which is adapted to grazing only. Most of the interveners live on the easterly ends of the strips of land they claim, and cultivate such portions of the bottom lands between the river and the foothills in the respective strips as they require. Near the river the land is what is termed bosque; that is, land covered with a growth of brush, trees and wild grass, and is used for pasturage. In the valley the strips of land are to some extent separated by fences and to some extent the bosque is separated in that way from the cultivated lands. From the foothills west there are no fences, nor are there any fences at the western boundaries of the strips or of the grant. By stipulation between the parties the titles to the lands between the river and the foothills are not to be determined in this action, but that does not exclude the evidentiary bearing, if any, which the use, occupation and claims of possession and ownership of these lands by interveners, respectively, so far as they appear in evidence, may have on their use, occupation and claims of possession, respectively, of the lands extending westerly from the foothills. The last named land bears a scanty growth of grass and other herbage and is without water, it being customary and necessary to have the animals pastured there go to the Rio Grande for water at intervals of three or four days, except for short and infrequent periods when their needs are supplied by rain or snow. By agreement, or common understanding, which has ripened into a general custom, the interveners and their predecessors in claim of

ownership have used those westerly portions of the strips
they claim, in common with each other and with others
claiming ownership in the grant, no one attempting to
keep his animals exclusively on the land he claimed nor re-
quiring others claiming ownership to keep their animals off
such land. To some extent those who were not claiming
ownership of any land within the grant pastured their ani-
mals on the portion of it in question west of the foothills
and on the strips claimed by the interveners with the other
animals pastured there, without objection by those who
claimed the strips, but without their consent, except as
they failed to take active measures to prevent such in-
trusion. This method of use was the one most convenient,
economical and advantageous to the interveners and as to
all the strips, except the northern one of Gonzales, the
only practicable one because of the size and shape of the
respective strips which would make the expense of fenc-
ing them greatly disproportionate to their value, the
character and location of the land, the scantiness of her-
bage and the lack of water upon it, and for no other
reasons appearing in the evidence." Separate Finding No.
7. "Jose Chaves, one of the interveners, claims a strip
of land situated within the Alameda Land Grant, extend-
ing from the Rio Grande on the east to the ceja of the
Rio Puerco on the west, and containing 80 varas in width
from north to south, and bounded on the north by land
claimed by Concepcion Trujillo de Sandoval, and on the
south by land claimed by Noyola Chaves; which said
strip corresponds to strip No. 10 of the list of strips
hereinafter referred to, and is claimed by intervener
and his predecessors in title by virtue of certain unrecord-
ed deeds of conveyance purporting to convey an estate in
fee simple thereto, for more than ten years next preceding
the beginning of this action, and consists of bottom land
between the Rio Grande and the foothills and the mesa,
or upland, extending west from the bottom land to the
ceja of the Rio Puerco. Of the latter land he and his
predecessors in title have had such possession as that de-
scribed in Finding 1 of Fact herein for more than ten
years next preceding the beginning of this action. On the

easterly portion of said strip, that between the Rio Grande and the foothills, said intervener and his predecessors in title have lived in houses which they built, and they have built on, fenced and cultivated such portions of said valley land as they required for their purposes, crops and stock, for more than ten years next preceding the beginning of this action; and in connection with it, they used the portion of said strip extending from it to the ceja of the Rio Puerco, as set forth in said Finding 1 of Fact herein." Finding No. 82. "That Captain Juan Gonzales lived upon said Alameda Land Grant, and that there has always been a large number of the heirs of said Captain Juan Gonzales living within the boundaries of said Alameda Land Grant. A portion of the heirs of said Captain Juan Gonzales who lived within said boundaries were: Mariano Gonzales, who is now living upon said grant and has lived there all his life; his father Jose Gonzales; his grandfather Santiago Gonzales; and his great grandfather Juan Gonzales, who lived on said grant all their lives; also Juan Antonio Rodarte, who has lived on said grant all his life; also, Merced Gonzales, and her father Miguel Gonzales, who have lived on said grant all their lives; also, Fabiana Gonzales and her father, Jesus Gonzales, who have lived on said grant all their lives; also, Candido G. Gonzales and his brother, Conrado A. Gonzales, and his father, Ignacio Gonzales, and his mother Abelina Garcia de Gonzales; also, his grandfather, Santiago Gonzales, and his great grandfather, Juan Gonzales, all of whom lived on said land grant all their lives; also, Florencio Gonzales, before he went to Lincoln county; also, Jose Gonzales and Manuel Gonzales and Sixta Gonzales, brothers and sister of Ignacio Gonzales, who lived on said grant all their lives." Finding No. 83. "It appeared, however, and is so found, that from a time farther back than the memory of any witness extended, the greater part of the land within the limits of the grant has been claimed and occupied in strips, as set forth in Finding of Fact 1, the land from the foothills to the ceja of the Rio Puerco in common for pasturage, and the bottom lands generally by those claiming the ownership of them separately, as set forth in said

finding. It did not appear that the heirs of Captain Juan
Gonzales or any of them living within the boundaries of
the grant had ever claimed or asserted any right to, or in-
terest in, any portion of said land grant except such strips
as they claimed respectively until and except as appears
from warranty deed from Juan Antonio Rodarte to A. B.
McMillen for an undivided one-twenty-fourth part of
said grant, dated January 8th, 1907, and by warranty deed
from Merced Gonzales de Romero and Fabiana Gonzales
for the undivided one-fifty-sixth part of said grant, dated
February 27th, 1907; and it did not appear that they or
any of them occupied or used any portion of said grant
except as others within the grant occupied and used the
strips they claimed, the bottom lands in severalty and the
grazing lands in common, as set forth in said Finding of
Fact 1." Finding No. 74 gives a list of 162 separate strips
of land, together with the name of the owner, the number
of varas wide from north to south, and a number is given
each tract. The terms of the separate decrees in favor of
the interveners is: "It is further considered, adjudged and
decreed that the intervener, Jose Chaves, is the owner in
fee simple, absolute and in severalty of the following de-
scribed strip, tract and parcel of land situate within the
limits of the Alameda Land Grant, bounded and described
as follows: Containing 20 varas in width from north to
south, and in length extending from the Rio Grande on the
east to the ceja of the Rio Puerco on the west, and bounded
on the north by land claimed by Felix Tafoya y Gonzales
and on the south by land claimed by Jose Gonzales y Mon-
toya; and which said strip corresponds to strip No. 20 of
the list of strips referred to in the findings of fact in said
cause and in the list of strips annexed hereto and made a
part of this decree." The court, in Nos. 76, 77 and 78,
found that the grant was made to Francisco Montes Vigil;
that he conveyed the land to Captain Juan Gonzales, on
the 18th day of July, 1712, as alleged, and that the grant
was confirmed as a perfect grant. The record contains
translations of exhibits 28, 28A and 28B, purporting to
be deeds and a will under which Candido G. Gonzales
claims ownership of one certain tract, also, exhibits 65,

65A and 65B, purporting to be conveyances under which Francisco Lucero y Montoya claims ownership. No other testimony, either oral or documentary, is found in the record. The conveyances referred to in the findings of fact, under which interveners claim ownership, are not found as exhibits in the record, nor is there any evidence tending to dispute the findings that the interveners and their predecessors in title claimed the lands by virtue of "certain deeds of conveyance, purporting to convey an estate in fee simple." Where the record does not bring up the evidence for examination by the court, the findings of the court upon questions of fact will not be disturbed in this court. Cunningham v. Springer, 13 N. M. 290.

There being no specific assignment of error raising this question, and in view of the statement in the brief of counsel for appellants that "no one of the interveners, by any instrument of writing introduced in evidence, showed title in himself coming from Captain Juan Gonzales" * * * * * and the further statement that, "while in some cases the length of the possession was questionable, the appellants did not question the right of the interveners to the land actually cultivated or inclosed by them, it must be assumed that the conveyances under which the respective interveners claimed title were before the court, and, together with such other evidence as may have been introduced, supported the findings of the lower court," we are of opinion that the findings of the trial court are within the principle announced by this court in the cases: Hamilton Mining Co. v. Hamilton, 14 N. M. 272; Hagerman Irrigation Company v. McMurray.

This brings us to the consideration of the main question in this case, and, in view of the large amount of litigation which has arisen and will no doubt continue to arise in this territory, the decision of the case will be of great importance. Counsel on both sides seem to desire that the case shall be decided upon its merits and not upon technical grounds, that the rightful owners of the land in controversy may have their titles passed upon and set at rest. In the partition proceeding, and prior to the setting up of the claims of the interveners, the court

had rendered a preliminary decree declaring the rights of the partition claimants (the heirs of Captain Juan Gonzales), to be as follows: "The parties hereinafter mentioned and to whom the respective undivided interests in said lands are decreed, are the owners of said tract of land in fee simple, as tenants in common, in proportions as indicated by the fractions set opposite their respective names, and that no person or persons other than said parties hereinafter mentioned have any interest in, or title to, said land or any part thereof, in possession, remainder, reversion or otherwise, except as hereinbefore excepted," but at the close of the case, after rights of the interveners had been fully litigated, the court rendered the following final decree: "It is therefore ordered, adjudged and decreed that the said interveners above mentioned are entitled to hold the tracts of land set off to them in the foregoing decree in severalty, free from all claim or claims of the plaintiff in this action and her co-tenants or their successors or assigns. And the plaintiff, her co-tenants and their successors or assign are enjoined and forever barred from claiming any right, title or interest in or to any of the land above described, whether under the decree of partition heretofore entered in this cause or otherwise." Obviously these decrees are in direct conflict, inasmuch as they relate to the same land, at least to a considerable extent, and the court, recognizing this, set aside the former decree.

The vital question presented by this appeal, then, is, did the court err in rendering the latter decree? The answer, as disclosed by the learned discussion in the briefs of counsel, and in oral arguments as well, must be found, so far as the interveners' rights are concerned, at least, in the intent and purpose of the legislature of the territory in the enactment of Chapter 17 of the Laws of 1858. Section one of this chapter, now section 2937, Compiled Laws 1897, is set out in full later on. For forty-one years this section remained in its original form, and but one unimportant amendment has been made to it. In 1899 the legislature made the following amendment by way of substitution, beginning with the first proviso:

"Provided, that if any person entitled to commence or prosecute such suit or action is, or shall be, at the time the cause of action therefor first accrued, imprisoned, of unsound mind, or under the age of twenty-one years, then the time for commencing such action shall in favor of such persons be extended so that they shall have one year after the termination of such disability to commence such action; but no cumulative disability shall prevent the bar of the above limitation, and this proviso shall only apply to those disabilities which existed when the cause of action first accrued and to no other." The only changes made by this amendment was to modernize the language of the substituted portion; limit the disabilities for which time to sue is given, to those imprisoned, of unsound mind or under the age of 21 years, and to reduce the time in which suit must be brought after removal of disability from three years to one. It may be said, therefore, that this section is still substantially as it was originally enacted in 1858. It becomes a pertinent inquiry, at this point, as to what were the conditions existing at the time necessitating or making desirable the enactment of such a statute, and in order that we may have a better understanding of the intent and purpose of the legislature in drafting its provisions we will put the inquiry in an interrogative form; what beneficial purpose was such a statute designed to subserve? We have been impressed with the observations of counsel for the appellees as to the conditions then existing and which demanded a solution such as this law affords, taking the view that this section was not intended to be a statute of limitation and repose merely, but was also intended to grant affirmative relief by way of conferring title upon the pioneer agricultural settlers as a reward of honest toil and diligence, indicating good faith in the settlement and improvement of what was at that time a comparatively barren and sparsely settled section, as, indeed, the whole territory was at that time, for that matter. Going back of the time of the enactment of this statute, an historical reference would seem to be appropriate. The Republic of Mexico, following the achieve-

ment of its independence from the parent country, had continued the policy of granting lands to individuals. These grants were dormant and useless until population made settlement thereon. In the possession of the titled grantee (and we refer to a military title) they were a source of weakness rather than of strength to the province. Prior to the enactment an increasing number of people from year to year were seeking settlement upon these grants and were making use thereof by a civilized cultivation. Transfers of lands embraced within land grants had been made with considerable frequency. This is evident from the very large number of exhibits in the case at bar. Some of the grantees of the grant, when the contest between the Republic of Mexico and the United States in the War of 1846-47 came on and was ended by the Treaty of Guadalupe Hidalgo, doubtless abjured the province of New Mexico and remained citizens of the Republic of Mexico. The people of this territory were thoroughly familiar with the existing conditions and with the prior traditions and practice. It was within the decade following the acquisition of New Mexico by the United States. American and European settlers were coming this way. The native population was also increasing and it was obvious to the people and the law-making power, that efforts would be made, as such efforts are now being made, to disturb grantees, occupiers, heirs, and devisees in their respective possessions held by written evidence of title. Possession that these claimants had lawfully acquired and for which they had paid a consideration. These settlers and occupiers had defended the soil and the people occupying it from the incursions of the Indians. This had been done at a very great sacrifice. The law making power, confronted with these conditions and appreciating the necessity for legal protection, not only from fictitious claimants, but from claimants who had long slept upon their rights as well, enacted this statute and thus assured protection to persons possessing land described in their deeds, assurances and devises, in their bona fide claim or ownership. The legislature, therefore, enacted the statute in question

and intended to create, and did create, a right and title as to real property acquired in a land grant and provided another and different rule of limitation as to real property which might be adversely acquired under Section 2938. It should be understood that, in so far as this case is concerned, the construction placed upon Section 2937, supra, is made applicable to Spanish or Mexican land grants only, as the grant lands herein described are within such a grant. The grants of lands by the United States, which might be of a very different nature, are not deemed pertinent to the decision of this case.

Before adverting to Section 2938, the section which appellants insist is controlling as to appellee's claims we will examine Section 2937 somewhat more in detail. It is not, and cannot be successfully denied, that the section provides an absolute limitation of the right to bring suit, either in law or equity, after the lapse of ten years, as against those in possession within the terms of the act, except where disability to sue exists, when suit may be brought within one year after the disability has ceased to exist. We need not further consider that provision of the section. But there is much more in this section, for the act is made specifically applicable to lands "granted by the governments of Spain, Mexico and the United States, or by whatever authority empowered by said governments to make grants to land." The Alameda Grant, being an individual grant, in private ownership, there can be no doubt of the application of this section to the lands embraced in the Alameda Grant, which had been in existence for one hundred and forty-eight years at the time this statute was enacted. Even at the time this law was passed these grants were largely owned by heirs and assigns of original grantees, and these heirs would, naturally, be widely separated from each other and few, if any, of them in actual occupation of the lands. The lands, being unoccupied and uncultivated, induced settlers to enter upon them and for many years before and after the American occupation these settlers have been occupying, cultivating and grazing these lands and purchasing, selling and devising and assigning them by deeds, wills and other docu-

ments and in good faith, claiming the ownership of the lands, notwithstanding these title documents may not be traceable to the real heirs or owners of the grant. Now this act provides that all of those persons, their children,
4. heirs or assigns who were in possession of portions of these lands for ten years, claiming them under the provisions of the act at the time of its enactment or at any time thereafer *"shall have a good and indefeasible title in fee simple to such lands, tenements and hereditaments."* This fee simple title is conferred upon all those who have complied with the conditions prescribed by the act. The conditions imposed are set forth in the act in clear and unambiguous language, as follows: "In all cases where any person or persons, their children, heirs or assigns, shall at the passing of this act or at any time thereafter, having had possession for ten years of any lands, tenements or hereditaments which have been granted by the governments of Spain, Mexico or the United States or by whatsoever authority empowered by said governments to make grants to lands, holding or claiming the same by virtue of a deed or deeds of conveyance, devise, grant or other assurance purporting to convey an estate in fee simple, and no claim by suit in law or equity effectually prosecuted shall have been set up or made to the said lands, tenements or hereditaments, within the aforesaid time of ten years, then and in that case, the person or persons, their children, heirs or assigns, so holding possession as aforesaid, shall be entitled to keep and hold in possession such quantity of lands as shall be specified and described in his, her or their deed of conveyance, devise, grant or other assurance as aforesaid, in preference to all, and against all, and all manner of person or persons whatsoever; and any person or persons, their children or their heirs or assigns, who shall neglect or who have neglected for the said term of ten years to avail themselves of the benefit of any title, legal or equitable, which he, she or they may have to any lands, tenements or hereditaments, within this territory, by suit of law or equity effectually prosecuted against the person or persons so as aforesaid in possession, shall be forever barred, and the per-

son or persons, their children, heirs or assigns so holding or keeping possession as aforesaid by the term of ten years, shall have a good and indefeasible title in fee simple to such lands, tenements or hereditaments." Comparing the requirements of this section with the evidence as disclosed in the findings of fact, some of which are set out in full in a former part of this opinion, it cannot be doubted that the interveners, with possibly two exceptions, to be referred to later, have met all of the requirements of the statute, and even more than the statutory requirements. These settlers have been in possession for the time required, cultivating and improving the valley lands, although the statute is silent as to that, nor does it define the character of possession as prescribed by Section 2938, as amended, in relation to title by adverse posession. Appellees were holding and claiming certain described strips of land a certain number of varas wide from north to south and extending from the eastern to the western boundaries of the grant, claiming the lands under deeds of conveyance purporting to convey to them a fee simple title, and no suit has been either instituted or prosecuted by the appellants or any other person as provided for in the act. Indeed, it is not insisted that any such suit was instituted by the appellants, except the present action. The contention of appellants that the interveners did not show written title from the heirs of Captain Juan Gonzales, falls to the ground under this section, for the reason that only color of title is required. Color of title has been repeatedly defined by both text writers and the courts: "The courts have concurred, it is believed, without on exception in defining 'color of title to be that which in appearance is title, but which in reality is no title.' They have equally concurred in attaching no exclusive or peculiar character or importance to the ground of the invalidity of an apparent or colorable title; the inquiry with them has been, whether there was an apparent or colorable title, under which an entry or claim has been made in good faith. The authorities seem to be conclusive to the point, that a claim to property, under conveyance, however inadequate to carry the true

title to such property, and however incompetent might have been the power of the grantor in such conveyance to pass a title to the subject thereof, yet, a claim asserted under the provision of such a deed is strictly a claim under color of title, and one which will draw to the possession of the grantee the protection of the statute of limitations, other requisites of those statutes being complied with. This subject was somewhat recently before the Supreme Court of the United States, and the former decisions of that court upon the question were elaborately examined, and the conclusion was declared in accordance with these views, and it was decided that what is color of title is matter of law, and when the facts exhibiting the title are shown, the court will decide whether they amount to color of title. But good faith in the party, in claiming under such color, is a question of fact for the jury." Tyler on Ejectment and Adverse Enjoyment, pp. 872, 873. In Wright v. Mattison, 18 How. 50, the court says: "We deem it unnecessary to examine in detail the numerous decisions adduced in the argument for the plaintiff in error, to define and establish the meaning of the phrase, 'color of title.' The courts have concurred, it is believed, without an exception, in defining 'color of title' to be that which in appearance is title, but which in reality is no title. They have equally concurred in attaching no exclusive or peculiar character or importance to the ground of the invalidity of an apparent or a colorable title; the inquiry with them has been whether there was an apparent or colorable title, under which an entry or a claim has been made in good faith." The above case is a leading one and is supported by a long line of cases, both in the United States and state courts. Schrimpscher v. Stockton, 183 U. S. 298; Cameron v. United States, 148 U. S. 307. In the case of Lea v. Polk County Copper Co., 21 How. 493, the court says: "Where a person was in possession, this was sufficient notice to a claimant of an adverse title; and whether the deed under which this person claimed, was registered or not was of no importance to the claimant. The act of limitations of the State of Tennessee protects persons in possession of land under the following

circumstances: 'First, they must have had seven years possession of land granted by the state; second, they must have held or claimed the land by virtue of a deed of conveyance, or other assurance, purporting to convey an estate in fee simple; third, no claim by suit in law or equity, effectually prosecuted, should have been set up or made to said lands within that time.' Under the second head, an unregistered deed is sufficient to constitute the bar. The deed, when recorded, related back to its date." We refer to this case, not only to support the doctrine of color of title, but because of the declaration therein that it is immaterial whether the claimant's deed is recorded or not. In the findings of fact in this case it is shown in some cases that the deed of conveyance under which certain interveners claimed title had not been recorded. Packard v. Moss, 68 Cal. 128. The court found that Captain Juan Gonzales and a large number of his heirs lived within the boundaries of the Alameda Grant and a few of them are mentioned in one of the findings; but the court further finds, in No. 83, that: "It did not appear that the heirs of Captain Juan Gonzales or any of them living within the boundaries of the grant, had ever claimed or asserted any right to or interest in any portion of said land except such strips as they claimed, respectively, until and except as appears from warranty deed from Juan Antonio Rodarte to A. B. McMillen for an undivided one-twenty-fourth part of the grant, dated January 8th, 1907, and by a warranty deed from Merced Gonzales de Romero and Fabiana Gonzales for the undivided one-fifty-sixth part of the grant, dated February 27th, 1907; and it did not appear that they or any of them occupied or used any portion of the grant except as the other strip owners occupied and used theirs." It was also found that from a time farther back than the memory of any witness extended, the greater part of the land within the grant has been claimed and occupied in strips, as set forth in Finding No. 1.

Persons of the same name appear in the lists of claimants on both sides, and, under the above finding, they may be the same persons. The record does not in-

·form us upon this point. An examination of Section 2937 shows that the fee simple title provided for ripens, even against the rightful heirs or true owners of the grant. The section provides that it shall accrue "against all, and all manner of person or persons whatsoever, and any person or persons, their children or their heirs or assigns, who shall neglect or who have neglected for the said term of ten years, to avail themselves of the benefit of any title, legal or equitable, which he, she or they may have to any lands, tenements or hereditaments, within this Territory, by suit of law or equity effectually prosecuted against the person or persons so as aforesaid in possession, shall be forever barred." This language is not ambiguous, it needs no construction, and there is no reservation or limitation in it which would protect the heirs of Captain Juan Gonzales, admitting that they were the true owners of the grant, from the operation of this provision and from the maturing of a fee simple title against them. The rule of law is well settled that where one is in actual possession of a portion of the tract under color of title, his possession will be presumed to extend by construction to the limits of the land described in his deed. This is too well settled to require the citation of authorities to support it. Indeed, appellants' counsel, in his brief, concedes this in almost identical language. Applying this doctrine to the interveners in this case, it being admitted that they actually occupied and cultivated that portion of their strips of land lying in the valley, such possession would extend to the entire tract described, including the grazing lands on the mesa. And the court finds that they actually used the lands other than cultivated for pasturage and grazing, the only use of which the lands were susceptible, so that their possession does not rest alone upon the legal presumption of possession.

From the review of the case thus far, it is difficult to see how the court in the final decree rendered in this case committed error unless Section 2937, supra, be either ignored or declared void. No attack is made upon the validity of the section, nor any suggestion that it has been repealed, but a different construction is contended

for. The construction sought to be placed upon this section by appellant's counsel is, in his own language, as follows: "Our view of the meaning of that statute is that no one can claim under it except those who are claiming through a grant from Spain, Mexico, or the United States, and that in order to show that he has such claim he must trace by documents a derivative chain of title from one of those sources. In no other way can the peculiar wording of this statute be given meaning, in other words, it is the purpose of that statute to cure titles which are imperfect, because some deed in the chain of title is imperfect." This construction seems to require so much more than the section specifies, as to place it in direct conflict with it. The conveyances required by the section are "deed or deeds of conveyance, devise, grant or other assurance purporting to convey an estate in fee simple." One deed or a devise by will seems to meet the requirement, provided it purports to convey a fee simple title. Indeed, the construction contended for, carried to its logical conclusion, would render it impossible to obtain any benefit whatever under the statute, and it seems to us that such a construction is plainly inconsistent with the remedial purpose and intent of the legislature which enacted it, as indicated by the unambiguous language used. Where language used in a statute is plain and unambiguous, it is not the subject of construction. It is further contended, "that in order to acquire title by adverse possession all of the requirements above mentioned are absolutely essential, and the courts of this territory have steadily adhered to that rule. That in order to constitute adverse possession it must be actual, open, visible, notorious, continuous, exclusive, hostile, and under claim of right." This is a correct statement of the law as to the acquirements of title by adverse possession under ordinary limitation statutes such as are commonly enacted, where title enures simply by reason of a limitation and not by virtue of a fee simple title provided as an affirmative right, as in Section 2937. Section 2938, Compiled Laws 1897, is a general statute of limitation, pure and simple, with direct application to titles sought to be ac-

quired by adverse possession for the same length of time required by Section 2937, and both of these sections formed parts of Chapter 17, Laws 1858. Section 2938 was Section 2 of Chapter 17, Laws of 1858. This section has been materially amended by two legeislatures, and, as amended, is as follows: "Section 2938. No person or persons, nor their children or heirs, shall have, sue or maintain any action or suit, either in law or equity, for any lands, tenements or hereditaments, against any one having adverse possession of the same continuousiy in good faith, under color of title, but within ten years next after his, her or their right to commence, have or maintain such suit shall have come, fallen or accrued, and all suits, either in law or equity, for the recovery of any lands, tenements or hereditaments so held, shall be commenced within ten years next after the cause of action therefor has accrued: Provided, that if any person entitled to commence or prosecute such suit or action is, or shall be, at the time the cause of action therefor first accrued, imprisoned, of unsound mind, or under the age of twenty-one years, then the time for commencing such action shall in favor of such persons be extended so that they shall have one year after the termination of such disability to commence such action, but no cumulative disability shall prevent the bar of the above limitation, and this proviso shall only apply to those disabilities which existed when the cause of action first accrued, and to no other. 'Adverse possession' is defined to be an actual and visible appropriation of land, commenced and continued under a color of title and claim of right inconsistent with and hostile to the claim of another; and in no case must 'adverse possession' be considered established within the meaning of the law, unless the party claiming adverse possession, his predecessors or grantors, have for the period mentioned in this section continuously paid all the taxes, territorial, county and municipal, which during that period have been levied upon the land or interest claimed, whether assessed in his name or that of another." This section was amended by Chapter 63, Laws 1899, but the only substantial change made was the addition of the fol-

lowing provision : "Against any one having adverse possession of the same continuously in good faith, under color
of title, and who has paid taxes lawfully assessed against
the same," and fixing one year instead of three as to
those under disabilities specified.    In 1905, this section
was further amended by the addition of the significant
clause beginning with the definition of adverse possession
in the section above quoted.    It will be seen, therefore,
that while section 2938 has been amended so as to require
color of title in good faith, payment of taxes, and made
specifically an adverse possession statute, and the term
'adverse possession' has been defined by the statute, not
one of these provisions have been inserted by amendment
in Section 2937.    The latter section remains practically
unchanged.    Counsel for appellants insist strenuously that
the only title appellees have is by adverse possession.    It
appears, however, that the section under which they claim,
makes no mention of adverse possession, notwithstanding
the companion section of the same act has been amended
to so provide.    There seems to be no foundation for this
contention by appellants, so far as the statute indicates,
as the reverse seems to have been the intention of the
legislature.    Nor are the interveners tenants in common
as among themselves, as they claim in severalty and independently of each other ; nor are they tenants in common,
or co-tenants with the heirs of Captan Juan Gonzales,
as they do not claim to own the grant or any interest in
the grant as such, as heirs of undivided interests. and
they deny that they are tenants in common with appellants, who claim to be the true owners of the grant in
undivided interests.    Consequently, the possession of the
interveners cannot be possession at all, in the sense that
the possession of one co-tenant is the possession of all
other co-tenants.    Interveners claim in severalty separately described tracts of land, to which title in fee simple
has ripened in each of them under Section 2937, supra,
and not by adverse possession except in a general sense.
They hold under a statute which provides that when they
have complied with the terms of the statute they shall
have a fee simple title, and *they shall be entitled to keep*

*and hold in possession such quantity of lands as shall be specified and described in his, her or their deeds of conveyance, devise, grant or other assurance as aforesaid in preference to all and against all and all manner of person or persons whatsoever."*

The contention of appellant's counsel, which is deserving of most serious consideration, is that announced in the case of Hunnicutt v. Peyton, 102 U. S. 333, in which the court says: "Where the rightful owner is in the actual occupancy of a part of his tract, he is in the constructive and legal possession and seisin of the whole, unless he is disseised by actual occupation and dispossession, and where the possession is mixed, the legal seisin is according to the legal title, so that in the case at bar there could be no constructive possession on the part of the defendant or his grantors, even if that might exist if he has had actual possession of a part, and no one had been in posession of the remainder." This doctrine has been adopted and announced by this court in the case of Jenkins v. The Maxwell Land Grant Co. et al., 15 N. M. 281, 107 Pac. 739, and other cases. It seems to have been applied by the courts in all of the applicable cases which have been examined wherein claimants have sought, by adverse possession to hold lands, even against the owner of the true title. It will be observed, however, that these are cases where the assertion of title by adverse possession is based upon statutory provisions similar to those of Section 2938, supra, which bars a right by action after the statutory period of time has elapsed. The claimants by adverse possession in these cases do not assert title, but merely the bar of the statute denying a right of action even to the owner of the true title. Section 2938, Compiled Laws 1897, is the law of this territory upon which claims of adverse possession are based, and is purely a statute of limitation which does not purport to give an affirmative title in fee simple, as does Section 2937, above referred to. The case of Probst v. Presbyterian Church, 129 U. S. 182, is instructive upon this point. This case arose in the City of Santa Fe, under Section 81, Compiled Laws of 1884, which is identi-

cal with Section 2938, Compiled Laws 1897, prior to its amendment. At this time this section did not require either color of title or payment of taxes to be shown in support of the claim of adverse possession. The Supreme Court of New Mexico substantially held that possession for the statutory period was insufficient, but that color of title was also required. The Supreme Court of the United States, upon appeal, reversed the lower court, using the following language: "Nor is it necessary that the defendant shall have a paper title under which he claims possession. It is sufficient that he asserts ownership of the land, and that this assertion is accompanied by an uninterrupted possession. It is this which constitutes adverse possession, claiming himself to be the owner of the land. This is a claim adverse to everybody else, and the possession is adverse when it is held under this claim of ownership, whether that ownership depends upon a written instrument, inheritance, a deed, or even an instrument which may not convey all the lands in controversy. If defendant asserts his right to own the land in dispute, asserts his right to the possession, and his possession is adverse and uninterrupted, it constitutes a bar which the statute intended to give to the defendant." The latest declaration of this court upon this subject is in the case of John Jenkins v. The Maxwell Land Grant Co. et al., 15 N. M. 281, which case is also instructive upon the question of mixed possession. While the case was a comparatively recent one, it was claimed that the inception of the adverse possession was prior to the amendment of the statute requiring color of title and payment of taxes to be shown, and this was not questioned. Upon the question of mixed possession, however, the defendants invoked the doctrine laid down in the case of Hunnicutt v. Payton, supra, and it was sustained and applied. From the facts in that case it appeared that Jenkins lived and made small improvements upon a tract of about thirty acres of land, cultivated about five acres, but in addition he claimed, by adverse possession, more than six thousand acres of timber and grazing lands, not by fencing or marking the boundaries thereof, but because he and his

family rode around what he claimed to be his boundaries and drove the stock of other parties from the lands. It further appeared, however, that the Maxwell Land Grant Company was the owner of the true title and that during all of the years Jenkins resided there the company had headquarters and agents in Raton, which was upon the grant, and that the agents of the company mined and prospected for coal, and permitted other parties to do so also, upon the land and near Jenkins' house; that they leased portions of the Jenkins land, as well as other portions of the grant, grazed large herds of stock upon the lands, in short, the agents of the true owner used the lands as freely as if Jenkins had not been there. The court properly held in that case that the owner of the true title, by its agents, was in actual possession of a portion of the grant and therefore its seizin extended to all of the grant not actually occupied by Jenkins, which could not in any event extend to more than the thirty acres upon which Jenkins lived. As was said in the Hunnicutt case: "The reason is plain. Both parties cannot be seized at the same time of the same land under different title. The law, therefore, adjudges the seizin of all that is not in the actual occupancy of the adverse party, to him who has the better title."

Appellants claim the ownership of what they denominate the common lands, under deeds of conveyance from Juan A. Rodarte, Merced Gonzales de Romero and Fabiana Gonzales, of date 1907, to Alonzo B. McMillen, upon the theory that Montoya and the grantors of Mr. McMillen, being heirs of Captain Juan Gonzales, deceased, and in possession of a part of the Alameda Grant, were owners of the true title to those lands; that the common lands are not in the actual, but only in the constructive possession of the interveners and are therefore drawn to the true title by conclusive presumption, conceding a mixed possession to have existed. Finding of Fact No. 1 described the nature of the possession and use of the lands involved, as follows: "The interveners claim strips of land within the Alameda Grant very narrow in proportion to their length, most of them being only a few yards in width each, and

extending from the Rio Grande west to the ceja, or ridge, dividing the watershed of the Rio Grande from that of the Rio Puerco, and forming the western boundary of the grant, a distance of about sixteen miles. Most of them include land between the Rio Grande and the foothills at the west of the valley, which is adapted to cultivation, and the land extending from the foothills to the ceja of the Rio Puerco, which is adapted to grazing only. Most of the interveners live on the easterly ends of the strips of land they claim, and cultivate such portions of the bottom lands between the river and the foothills in the respective strips as they require. Near the river the land is what is termed 'bosque; that is, land covered with a growth of brush, trees and wild grass, and is used for pasturage. In the valley the strips of land are to some extent separated by fences and to some extent the bosque is separated in that way from the cultivated lands. From the foothills west there are no fences, nor are there any fences at the western boundaries of the strips or of the grant. By stipulation between the parties the titles to the lands between the river and the foothills are not to be determined in this action, but that does not exclude the evidentiary bearing, if any, which the use, occupation and claims of possession and ownership of these lands by interveners, respectively, so far as they appear in evidence, may have on their use, occupation and claims of possession, respectively, of the lands extending westerly from the foothills. The last named land bears a scanty growth of grass and other herbage and is without water, it being customary and necessary to have animals pastured there go to the Rio Grande for water at intervals of three or four days, except for short and infrequent periods when their needs are supplied by rain or snow. By agreement, or common understanding, which has ripened into a general custom, the interveners and their predecessors in claim of ownership have used those westerly portions of the strips they claimed, in common with each other and with others claiming ownership in the grant, no one attempting to keep his animals exclusively on the land he claimed nor requiring others claiming ownership to keep

their animals off such land. To some extent those who were not claiming ownership of any land within the grant pastured their animals on the portion of it in 'question west of the foothills and on the strips claimed by the interveners with the other animals pastured there, without objection by those who claimed the strips, but without their consent, except as they failed to take active measures to prevent such intrusion. This method of use was the one most convenient, economical and advantageous to the interveners and as to all the strips, except the northern one of Gonzales, the only practicable one because of the size and shape of the respective strips which would make the expense of fencing them greatly disproportionate to their value, the character and location of the land, the scantiness of herbage and the lack of water upon it, and for no other reasons appearing in the. evidence." If the interveners relied upon adverse possession under Section 2938, there can be little doubt but that the circumstances under which these mesa lands were held would constitute constructive possession, such as would, by legal presumption, adhere to the true title. If, however, the conclusions of the court in the construction of Section 2937. are correct, as we regard them, this is not a proceeding in adverse possession under Section 2938, so far as the interveners' rights are involved, but is a proceeding under Section 2937, in which interveners rely upon a fee simple title by deeds under the terms of the statute. As we have seen, a fee simple title matured under Section 2937, divests the title of the true owner as well as all others, and such being the case, the law as laid down in the case of Hunnicutt v. Peyton, supra, would seem to be inapplicable to the case now under consideration. It is true, there is an adverse possession required to mature title under Section 2937, but it is not the same as under Section 2938. This section was amended by Section 2, chap. 63, Laws 1899, so as to require color of title and payment of taxes, as above stated, and by Chapter 76, Laws 1905, was again amended as follows: " 'Adverse possession' is defined to be an actual and visible appropriation of land, commenced and continued under

a color of title and claim of right inconsistent with and hostile to the claim of another; and in no case must 'adverse possession' be considered established within the meaning of the law, unless the party claiming adverse possession, his predecessors or grantors, have for the period mentioned in this section continuously paid all the taxes, territorial, county and municipal, which during that period have been levied upon the land or interest claimed, whether assessed in his name or that of another."

Now, the fact that neither of these amendments were made applicable to the next preceding section, but were made specifically applicable to Section 2938, is quite significant and we think indicates the intention of the legislature not to make these requirements applicable to the section of the statute which confers a fee simple title as provided for in Section 2937.

In this case, under the findings of fact, the interveners claim, severally, strips of land "under deeds of conveyance purporting to convey an estate in fee simple," accompanied by residence and cultivation as to bottom lands, and the timber and grazing lands were used for the only purpose for which they were suitable, as the findings state, for more than ten years. These conveyances define the boundaries of such strips, from which it appears that the timber and grazing lands are included in the boundaries, as well as the residence and cultivated lands. The interveners, being actual occupants and in possession of the lands embraced in their deeds, would have the right to use them in such manner as they saw fit, and we see no reason why they should not use them as other owners of deeded lands may do.

The final decree has a provision as to each of the interveners similar in terms to that of Jose Chavez, which is as follows: "It is further considered, adjudged and decreed that the intervener, Jose Chavez, is the owner in fee simple absolute and in severalty of the following described strip, tract and parcel of land situate within the limits of the Alameda Land Grant, bounded and described as follows: Containing 20 varas in width from north to south, and in length extending from the Rio Grande on

the east to the ceja of the Rio Puerco on the west, and bounded on the north by land claimed by Felix Tafoya y Gonzales, and on the south by land claimed by Jose Gonzales y Montoya; and which said strip corresponds to strip No. 20 of the list of strips referred to in the findings of fact in said cause and in the list of strips annexed hereto and made a part of this decree." The interveners, by this decree, hold their respective tracts of land as "owners in fee simple absolute and in severalty" to the exterior boundaries of the description given in this deed, there being no limitations in the deeds.

In order to invoke the doctrine laid down in the case of Hunnicutt v. Peyton, supra, it is essential that the owner of the true title, or his heirs or agents, shall be in actual possession of some part of the lands while claiming the whole of the lands. It is clear, from Finding of Fact No. 83, that the heirs of Juan Gonzales who resided on this land, did not claim to own the whole grant, nor even the common lands. Upon this point the court found as follows: "It appeared, however, and is so found, that from a time farther back than the memory of any witness extended, the greater part of the land within the limits of the grant has been claimed and occupied in strips, as set forth in Finding of Fact 1, the land from the foothills to the ceja of the Rio Puerco in common for pasturage, and the bottom lands generally by those claiming the ownership of them separately, as set forth in said finding. It did not appear that the heirs of Captain Juan Gonzales or any of them living within the boundaries of the grant had ever claimed or asserted any right to or interest in any portion of said land grant except such strips as they claimed respectively until and except as appears from warranty deed from Juan Antonio Rodarte to A. B. McMillen for an undivided one-twenty-fourth part of said grant, dated January 8th, 1907, and by warranty deed from Merced Gonzales de Romero and Fabiana Gonzales for the undivided one-fifty-sixth part of said grant, dated February 27th, 1907; and it did not appear that they or any of them occupied or used any portion of said grant except as others within the grant oc-

cupied and used the strips they claimed, the bottom lands in severalty and the grazing lands in common, as set forth in said Finding of Fact 1." From this finding it appears that Vincente Montoya, appellant, and the grantors of McMillen were strip owners only and never made any claim to ownership of any lands of the Alameda Grant other than described in the small strips on which they respectively resided. In other words, they held their lands just as they held their tracts. Therefore, they did not claim to own the whole grant, or all the common lands thereof as heirs of Captain Juan Gonzales, but only claimed to own and be in possession of the small strip upon which their residences were. If this is true, they were not in position to invoke the presumption insisted upon by appellant's counsel, nor are they within the doctrine announced in the Hunnicutt case. Indeed, the interveners, being in possession of a part, claiming certain strips of land described in deeds of conveyance, are the parties to whom the benefit of this presumption would enure to the extent of the lands embraced within the exterior boundaries of their respective deeds.

There are two tracts of land claimed by Candido G. Gonzales and Francisco Lucero y Montoya as to which the findings are somewhat different, in this: that neither of them ever lived upon or improved any portion of the lands described in the conveyances under which they claim ownership. As to the Gonzales tract, which is the last of several tracts he claims, the following finding of fact was made by the court: "The Rio Grande now runs close to the foothills by this land, and there is practically no meadow land between the foothills and the river. Formerly there was a strip of bottom land between the Rio Grande and the foothills which formed a part of the tract herein claimed by the intervener, but neither he nor his predecessors in title, nor any other person so far as the evidence shows, ever cultivated, enclosed, erected buildings or lived upon any part of said tract, or made any use of it except for grazing, as set forth in Finding of Fact 1. The court further finds that the description of the real estate in said Exhibit No. 28 was originally

of a tract of land 610 varas wide, and that said description was so altered as to describe the land as being 1610 varas wide; but the court is unable to find when said alteration was made, except that it was made after the original instrument was written, in a different ink, and was made some time prior to the year 1883." While it may be that lapse of time may have cured defects suggested by appellant's counsel to the documentary evidence of title admitted at the trial, the fact that no actual possession was ever established on any portion of this tract we are disposed to regard as fatal to a recovery by Gonzales of this particular tract, and the same may be said of the Lucero y Montoya tracts covered by Exhibits 65, 65A and 65B, as no actual possession of any part of those lands was established although part of the lands were capable of cultivation. We have just sustained the possession of the interveners to the mesa lands adjoining the valley land, by reason of its use for grazing purposes, but this was done upon the ground that by reason of actual residence, cultivation, improvements, and other visible occupancy of a part of the lands embraced in their deeds, by conclusive legal presumption this possession extended to the whole tract embraced in the conveyances. But, even under Section 2937, deeds alone are not sufficient, unaccompanied by actual occupation of at least a part of the tract, to mature a fee simple title in ten years. The possession is as essential to that end as the deed, but both are necessary. As to those tracts, there never has been actual visible possession of any part of the lands, therefore, conceding that the conveyances were valid, fee simple title could not mature under the circumstances of this case. Bergere v. U. S., 168 U. S. 66; Whitney v. U. S., 168 U. S. 529.

A peculiar and quite unusual situation exists in this case. A decree of partition was entered and the unoccupied lands were declared to be the property of the appellant and a large number of the heirs and assigns named in the decree. The decree did not state that they were in possession of the lands, but did declare them to be owners of certain interests therein. This decree was entered be-

fore the rights of the interveners were declared. This decree was not formally set aside by the court, but, in effect, was modified to the extent of the lands awarded to the interveners in the final decree upon the intervention. The effect of the decree in partition is to award to the partition claimants the ownership of all lands involved in this proceeding not carved out of the Alameda Grant by the decrees in favor of the interveners. Fee simple title not having matured in favor of Candido G. Gonzales and Francisco Lucero y Montoya to these particular tracts, the decree in partition is operative upon those lands and awards them to the partition claimants, hereby divesting those interveners, Gonzales and Lucero, of any interest therein.

We do not deem it necessary to consider the other questions raised as to these lands. The assignments of error will be overruled insofar as they challenge the correctness of the decree of the court in favor of the interveners and the decree will be affirmed insofar as it relates to all of the tracts owned by the interveners, but will be sustained as to the two last mentioned tracts and as to those the decree will be reversed and the cause will be remanded for further proceeding in accordance with the views herein expressed.

[January 2, 1912.]
### MEMORANDUM OPINION ON REHEARING.

#### SYLLABUS.

1. Section 2937, Compiled Laws, is constitutional, and does provide for due process of law. It is more than an ordinary statute of limitation and provides for certain affirmative relief following the expiration of the period of limitation.

#### OPINION OF THE COURT.

M'FIE, J.—The motion for rehearing in this case raises but one question, and that the unconstitutionality of Section 2937, Compiled Laws of New Mexico, and the court having considered this question, together with the oral arguments and briefs of the respective counsel, ad-

Montoya v. Heirs, 16 N. M. 349.

heres to the opinion heretofore rendered. Counsel for appellants is in error in the suggestion that the court holds in the original opinion that Section 2937, supra, is not a statute of limitation, as it is apparent from the original opinion that this section is a statute of limitation, but goes further and points out that it is not solely a statute of limitation in the same sense as is that provided for in Section 2938, Compiled Laws 1897, but, being limited to a specific classification of lands, that of land grants, it is more than an ordinary statute of limitation and provides for certain affirmative relief following the expiration of the period of limitation, such as is deemed specifically applicable to the condition of grant lands as the same existed at the time Section 2937, supra, was enacted. The period of ten years, fixed in the statute for all those seeking to avoid its operation, is deemed a reasonable time and meets the suggestion that this section does not provide due process of law. We are of the opinion that the fact that this section has been in existence in substantially its original form for about sixty years, whereas Section 2938 has been substantially amended, indicates that Section 2937, supra, was enacted to meet the peculiar conditions existing in this territory in that early day concerning the particular land classified in the section, and, as applied to the peculiar conditions existing at the time, this section of the statute is not obnoxious to the constitutional objections sought to be raised in the motion for rehearing. The original opinion, therefore, will be adhered to as the opinion of the court in this case.

### DISSENT.

WRIGHT, J.—In view of the matters raised on the rehearing, I am unable to adhere to the former opinion and therefore withdraw my concurrence and here indicate my dissent because of the question raised upon reargument.