[No. 1901. July 21, 1917.]

MONTOYA v. CATRON, et al.

### SYLLABUS BY THE COURT.

1. Where title is claimed by adverse possession, under color of title the possession must be actual and not constructive in its nature. It must be a possession subjecting the land to the will and dominion of the occupant, and must be evidenced by those things essential to its beneficial use, and must be clearly defined, open, actual, visible, exclusive, hostile, and continuous.                P. 572

2. The doctrine of adverse possession is to be taken strictly, and is not to be made out by inference, but by clear and positive proof. Evidence examined, and held not to furnish clear and positive proof of adverse possession for the requisite length of time to give the claimant title to the land in dispute under section 3364, Code 1915.                P. 573

3. Where a party enters into possession of a tract of land conveyed to him under an invalid deed, which constituted color of title, and erected a house thereon and fenced and improved 27 acres out of the entire tract of 8,000 acres conveyed by his deed, and as to the remainder of the land simply grazed cattle upon it, and the true owner of the land, during the time appellant claims the statute was running in his behalf, likewise used said land for grazing purposes, and no portion of said land, save as stated, was inclosed and the adverse claimant took no steps to prohibit the true owner from using the land; such use of the land, not enclosed by the adverse claimant, by the true owner, neutralized the adverse possession of the claimant, and he acquired no title thereto.
                                            P. 578

Appeal from District Court, San Miguel County; D. J. Leahy, Judge.

Action by J. Hilario Montoya against Thomas B. Catron and another. From a judgment for defendants, plaintiff appeals. Affirmed.

S. B. DAVIS, JR., of East Las Vegas, and H. W. CLARK, of San Francisco, Cal., for appellant. REED HOLLOMAN, of Santa Fe, for appellees.

### OPINION OF THE COURT.

ROBERTS, J. This action was instituted in the district court of San Miguel county by appellant to quiet title to a tract of land claimed by him. The land so claimed was within the limits of the Antonio Ortiz grant, the record title to which was in the appellee. Appellant depended upon title acquired by adverse possession under color of title. His documentary title began with a petition presented December 17, 1867, by Francisco Rael to Trinidad Romero, then probate judge of San Miguel county, asking that a tract of land in the Rincon de las Chupimas be granted to him and an order of the probate judge granting him the land for which he asked. The land embraced within the grant comprised something over 8,000 acres of land, and, as stated, all of the land, so granted, was within the confines of the Antonio Ortiz grant, the legal title to which was in the appellee and his predecessors in interest. It is conceded by appellant that the probate judge was without authority to make the grant but it is claimed that the grant, so made, constituted color of title under section 3364, Code 1915, and it is under this section that he claims title, by adverse possession for a period of 10 years. Francisco Rael died in the year 1888, leaving as his heir one Jose Rael y Luna. The son conveyed to appellant the premises in question in the year 1898 by warranty deed. Appellant's claim to title by adverse possession is founded, first, upon claimed adverse possession by Francisco Rael for a period of 10 years from the year 1898, under his deed

from Jose Rael y Luna. The case was tried by the court without a jury.

Findings of fact were made by which the court found that, while Francisco Rael entered into possession of the premises in 1871 and constructed a house thereon, it was not shown by clear and convincing proof that said Rael remained in actual and continuous and adverse possession of the premises for a period of 10 years after his entering thereon. The court also found that appellant J. Hilario Montoya, entered upon the premises described in the complaint, in the year 1898, and constructed a house upon said land and made certain other improvements by constructing a dam across the Arroyo de las Chupinas and an irrigation ditch for the purpose of irrigating a few acres of land; and that from the year 1898 the appellant, either in person or by his employes, occupied and was in exclusive possession of certain described premises containing about 27 acres, more or less; that as to the remaining portion of the land claimed by appellant he did not continuously, exclusively, and adversely keep and maintain possession thereof.

The questions to be decided upon this appeal are: First, whether the court erred in finding that the evidence failed to show continuous and adverse possession for the required period by Francisco Rael; and, second, whether the evidence failed to show continuous adverse possession by appellant for the requisite period.

First, it may be stated that appellant contends that the grant made by the probate judge of San Miguel county, while invalid and void, constituted color of title under section 3364. Appellant says this section was almost a verbatim copy of chapter 28, Laws 1819, of an act of the Legislature of the state of Tennessee, and that under the construction of this act by the Supreme Court of Tennessee the grant made by the probate judge constituted color of title. This question, however, need not be determined in this case for reasons later appearing in this opinion.

[1] The determination of the question as to the sufficiency of the evidence to sustain the findings of the court as to the possession of Francisco Rael necessitates a review

of the evidence and a consideration of the law as to the quantum of evidence required in cases of this nature to establish the fact of adverse possession necessary to strip the legal owner of his title to the land claimed under the spurious title. The nature of the possession required to establish title by adverse possession is concisely stated by Jones' Blue Book of Evidence, vol. 1, § 79a, p. 382, as follows:

"The possession must be actual and not constructive in its nature; while the payment of taxes and similar acts of control may be evidence of the claim of right, they are not alone sufficient evidence of possession within the meaning of the rule. It must be a possession subjecting the land to the will and dominion of the occupant; it must be evidenced by those things essential to its beneficial use, and must be clearly defined, open, notorious, and continuous. It must be evidenced by acts indicating permanency of occupation. Moreover, the possession must be hostile in its inception, and exclusive and it must continue uninterrupted under claim of right to the boundaries of the land claimed; and, where title is evidenced by possession only, it must be limited to the claim asserted."

[2] Some courts go to the extent of holding that the adverse claimant must show, beyond any reasonable doubt; First, that he has been in adverse possession; and, second, that adverse possession has continued for the requisite length of time. Lessee of Ewing v. Burnett, 11 Pet. 41, 9 L. Ed. 624. In the same case the court quotes with approval from Jackson v. Sharp, 9 Johns, (N. Y.) 167:

"It is a settled rule that the doctrine of adverse possession is to be taken strictly, and not to be made out by inference, but by clear and positive proof. Every presumption is in favor of possession in subordination to the title of the true owner."

—and the Supreme Court of the United States, in the case referred to, said:

"There must not only have been an adverse possession, but such possession must have continued during the period of 21 years."

—speaking of the statute of the state of Ohio, which required adverse possession for a period of 21 years.

The rule stated in Corpus Juris, supported by the overwhelming weight of authority, is as follows:

"It is very generally held that to prove title by adverse possession, or any single element thereof, the evidence should be clear and convincing. It is also a rule of general application that such possession or element cannot be established by loose, uncertain testimony which necessitates resort to mere conjecture. Title by adverse possession cannot be established by inference or implication." 2 C. J. 276.

In the case of Jenkins v. Maxwell Land Grant Co., 15 N. M. 281, 107 Pac. 739, the court said:

"That to constitute adverse possession the occupancy of one so claiming must be: (1) actual; (2) visible; (3) exclusive; (4) hostile; and (5) continuous. If any one of these is lacking, no title by adverse possession can ripen."

We will now proceed to examine the testimony upon which appellant relies as establishing the adverse possession by Francisco Rael for the period of 10 years. The first witness testifying in this regard was Gregorio Alarcon. At the time of testifying he was 55 years of age. He stated that he had known the land in question since he was about 12 years old, at which time he first saw the house constructed by Francisco Rael upon the premises; he having called there to find a man. He had a talk with Rael on the place at that time, but testified as to nothing else relative to the possession by Rael until at a time when he was 18 years of age. He testified as to seeing cattle and sheep owned by Rael on the place, but the dates, number of animals, character or extent of possession, and in fact everything that goes to make up adverse possession, as it is known in law, is incomplete and uncertain. He testified to nothing as to the extent of the use to which Rael was putting the premises, or as to the continuity as to his possession.

We quote from appellant's brief the testimony of Rafael Lucero, a witness on behalf of the appellee who was 53 years of age at the time of testifying.

"Q. Before that time did you know the house they called the house of Francisco Rael? A. Yes, sir. Q. And that was

a half mile or so south of the house of J. Hilario Montoya built, was it not? A. Yes, sir; south and east. Q. On the arroyo? A. Yes, sir. Q. How long have you known that house? A. I have known that house for many years. Q. Ever since you were a very small boy? A. Yes; I was a small child about 12 years old. Q. And had you known it during all that time as the house of Francisco Rael? A. That is the way I knew it. Q. Did you know Francisco Rael? A. No, sir. Q. During the early years that you knew the house did you see it occupied by the men who were working for Francisco Rael? A. I saw it occupied many times, and other times I saw it vacant. Q. During those early years did you see any cultivation around that house? A. Yes, sir; from the house down. Q. And up to what time did you see that land cultivated? A. I think I only saw that place planted once or twice, and I was then very young. Q. Was there any wall around that land that was cultivated? A. There was a stone wall. Q. Did you, in those early years, see the sheep of Francisco Rael pastured on this land? A. I remember only that I saw cattle grazing. Q. You don't remember whether you saw any sheep or not? A. I might have seen sheep, but I didn't know whose they were. Q. Do you know who was looking after those sheep for Francisco Rael in those years? A. Yes, sir. Q. Who was it? A. They were herded by a man named Antonio Mondragon and Andreas Griego, the first I remember; afterwards a man was there named Sedillo and Pedro Ortega and Jose Estevan Ortega. These men were there until the year 1878 or 1879. In the year 1880 Messrs. Garrards sheared there, and there was no one in the house— in the year 1880, in the month of October, there was nobody in the house. Q. Were you working for the Garrards at that time? A. I hauled wool in a wagon with a yoke of oxen, and I was paid $2 for each wagonload of wool. Afterwards I turned the grindstone during the shearing time for a dollar per day, and they hauled the wool from there to Las Vegas, I and Rafael Garcia and a man named Carillo, with oxen teams. At that time the house was alone. * * *"

Redirect examination by Mr. Catron:

"Q. You say there was some land cultivated there close to the house of Francisco Rael when you first knew it? A. Yes, sir. Q. You say there was a fence around it? A. Yes, there was a stone wall, a very small stone wall around it. Q. How much land was cultivated in that stone wall? A. I don't think much to exceed 2 or 3 acres, it was a very small piece. Q. Was it as much as the inside of the plaza out there? A. I think more or less about that large, might be a little bit more. Q. How many years did you see that cultivated? A. I am not positive whether it was once or twice. Q. Can you say how long ago that was? A. I believe it was about the year 1870 or 1871 or 1872."

Appellant says in his brief:

"Reducindo Montoya says he saw the stone house (which must have been the house erected by Francisco Rael) on the ranch in the year 1874, and that the house was still there 16 years before the time of his testimony."

Leandro Baca, a witness for the appellant, testified as follows: (copied from appellant's brief)

"Q. Why do you call that lower house the house of Francisco Rael? A. I call that house of Francisco Rael because Francisco Rael was the owner of it. There were some men on the ranch, and they said the house was Francisco Rael. Q. For how many years have you known that house as the house of Francisco Rael? A. I became acquainted with that house in the year 1876. Q. And at that time was it known as Francisco Rael's house? A. By information of some persons?"

Facundo Sanchez testified that he knew this ranch in the year 1880 as the ranch of Francisco Rael; that he was there in that year herding sheep for a Mr. Hays; that at that time there was on the ranch the old house that belonged to Francisco Rael and another small house; that in 1880 these houses were occupied by Francisco Rael or his employes; that in that year he was twice forbidden by the men in charge of the ranch for Francisco Rael to trespass upon the ranch with his sheep, and the boundaries were pointed out to him, and repeated this testimony again on cross-examination, again stating that the employes of Francisco Rael prohibited him from grazing sheep on these premises in the year 1880.

Juan Pacheco stated that he has known the house of Francisco Rael for about 31 years.

Anastacio Rael testified on cross-examination as follows:

"Q. How long have you known that house that you call the house of Francisco Rael? A. More than 30 years. Q. Who built it? A. I don't know. Part of it was built, I believe, by Emilio Gutierrez and part by Juan Rael. Q. Was Emilo Gutierrez working for Francisco Rael or Juan Rael? A. For Francisco Rael. Q. During the first years you knew that house who occupied it? A. It was occupied by a man

named Antonio Mondragon.  Q.  Was he an employe of Francisco Rael?  A.  Yes, sir.  Q.  Was he herding sheep for Francisco Rael, or what?  A.  Cattle.  Q.  Who else during that years occupied that house?  A.  Many owners. Q.  The people who were working for Francisco Rael, you mean?  A.  Yes, sir.  Q.  And that condition continued, did it not, until Francisco Rael died?  A.  Yes, sir.  Q.  And during those years do you remember part of this land near the house was cultivated?  A.  Yes, sir.  Q.  While Francisco Rael was alive?  A.  Yes, sir.  Q.  It was cultivated by the men who were working for Francisco Rael, was it not?  A. Yes, sir.  Q.  You were well acquainted with Francisco Rael? A.  Very well.  Q.  Did he always own sheep there during all those years.  A.  Yes, sir.  Q.  And did he run his sheep on this land near his house?  A.  Yes, sir.  Q.  And his cattle also?  A.  Yes, sir.  *  *  *  Q.  And during all the years that you knew this property up to the time that Francisco Rael died, there was some land cultivated, was there not, when Francisco Rael was alive?  A.  Yes, sir; he has planted some down below.  Q.  Was there any irrigation during the time Francisco Rael or other people were cultivating that land for him?  A.  No, sir.  Q.  How much land was cultivated near the old house of Francisco Rael by him? A.  A little piece; might be as much as 3 or 4 acres.  Q. Was it as much as 3 or 4 acres?  A.  Yes, sir.  Q. And how much was cultivated at the upper place when that was cultivated?  A.  About two acres."

The foregoing constitutes all the evidence upon which appellant relies to establish adverse possession on the part of Francisco Rael.  This evidence falls far short, we believe, of establishing with that degree of certainty required the continuity of the possession of Francisco Rael.  There is not a word of testimony going to show the extent of his claimed possession, or negativing the fact that the legal owner of the premises might not have been exercising dominion over the property, or that others were not using the premises in common with Rael.  We think, therefore, that the court was justified in finding that appellant failed to sustain the burden which was upon him by establishing adverse possession by Rael by clear and convincing testimony.

As to the adverse possession claimed to have been shown by J. Hilario Montoya, it would be impractical to set out in this opinion all the evidence, pro and con, upon the proposition.  It is sufficient to say that in the year 1896 the defendant became attorney and agent for Wilson Wadding-

ham, owner of the grant, and under his authority assumed
the management and control thereof, and subsequently be-
came invested with the legal title; that after the year 1898,
when Montoya claims to have begun his adverse posses-
sion, many other people under authority from appellee,
as agent for Wilson Waddingham, and later as the owner
thereof, leased grazing privileges upon the grant, and these
lessees ranged and grazed their cattle and sheep over that
portion of the grant claimed by appellant. They used it in
like manner and to the same extent, as did Montoya, with
the exception of the inclosure. Montoya never erected any
fences or inclosures and simply grazed his stock upon the
land, and did not even confine them to the portion of the
grant claimed by him, but permitted them to graze upon
other portions of the grant. The lessees of Mr. Catron
made no attempt to confine their cattle to other portions
of the Ortiz grant, but permitted them to graze over the
disputed land, in the same manner as they employed other
portions of the grant. Thus it will be seen that the owner
of the legal title in the grant used and enjoyed the prem-
ises in question in the same manner as did the claimant,
and exercised the same acts of ownership and possession
over the same.

We think the evidence on the part of the appellant failed
to show possession and dominion over the land claimed by
him, except possibly as to the 27 acres, which is not in-
volved in this appeal, and that the court properly found
against him.

[3] Appellant contends that under the rule announced
by the territorial Supreme Court in the case of Montoya
v. Unknown Heirs of Francisco Montes Vigil et al., 16 N.
M. 349, 120 Pac. 676, the trial court having found that
appellant had held and occupied adversely 27 acres of land,
to which it awarded him judgment quieting his title, ap-
pellant became entitled to all the land called for by his
deed of conveyance under the statute heretofore referred
to. This case, however, is distinguishable from the Mon-
toya Case, in that there the heirs of the true owner were
not asserting title to the whole of the grant, but that each
was enjoying and claiming possession of only specified

portions thereof, while here appellee was asserting title to
the whole of the grant, or, to say the least, to that portion
of it claimed by appellant, and, further, in the Montoya
Case, the claimants were exercising control over the whole
of the lands claimed by them. While such possession and
control in the Montoya Case was exercised in common with
others like situated, the court found that such use of the
lands was the only use to which it was susceptible, the
strips being very narrow and not capable of being fenced
to advantage, and that, where the parties owning these
strips by agreement used them in common with others in
like situation, the requirements of the statute were com-
plied with. In the instant case, to say the least, there was
a mixed or concurrent possession by both parties to the
unfenced portion of the land claimed by appellant. Neither
party had actual and exclusive possession of it. In the case
of Norvell v. Gray's Lessees, 1 Swan (Tenn.) 96, the
Supreme Court of Tennessee, in discussing a similar stat-
ute, said:

"Both having an actual possession and occupation of dif-
ferent parts of the same tract, and each claiming an exclu-
sive right, the one under a valid, and the other under an in-
valid title, which shall be regarded as having the possession
of such part of the tract as may not be actually occupied by
either? Will not the law, in such case, as in other cases of a
mixed or concurrent possession, adjudge the seisin to be ac-
cording to the title, as far as there exists no actual adverse
possession."

And later in the case of Creech v. Jones, 5 Sneed (Tenn.)
631, the same court said:

"We are of the opinion, as stated in Norvell v. Gray's
Lessee, 1 Swan, 96, 107, that a peaceable entry, in such case,
by the rightful owner, would give him a legal seisin of all the
land within the interference of which the younger grantee, or
wrongful possessor, had not previously acquired the actual
possession by inclosure, or other erections. But such entry
would be no ouster of the actual possession of the wrong-
doer, and could not therefore have the effect to neutralize
the adverse possession, or to suspend the running of the stat-
ute, as to the part of the land actually occupied by the wrong-
doer. This effect, under the statute, could only be produced
by a suit at law, or in equity, effectualy prosecuted. As far,

however, as there was no actual adverse possession, the law would adjudge the possession to be in the party having the title; both parties having actual possession."

And later in the same opinion it was said:

"In reason, it would seem, that the possession necessary to neutralize an actual adverse possession ought to be similar in character, and equivalent in force, with the possession, the legal effect of which is sought to be thereby destroyed."

In the present case, assuming that appellant had actual adverse possession of the land conveyed to him by his deed from Luna, the evidence shows that during the greater part of the time during which he claims the statute was running in his favor, Mr. Catron, by his agents and lessees, was subjecting the land to the same use appellant was by pasturing sheep and cattle thereon; hence, in the words of the court quoted above, it was "similar in characted and equivalent in force" to the possession of Montoya.

It would be illogical to hold that a party could procure a spurious deed to a large tract of land and settle upon and improve 1 acre thereof and assert no dominion or control over the remainder, which, during all the time, would remain in possession and under the control of the true owner, and by retaining possession of the 1 acre for the requisite length of time oust the true owner of the possession of the entire grant by producing upon the trial the deed conveying the same to him. We do not believe the statute in question was ever intended to have such effect.

For the reasons stated the judgment of the trial court will be affirmed; and it is so ordered.

PARKER, J., concurs. Chief Justice Hanna, being absent, did not participate in this opinion.