**GARCIA et al. v. UNITED STATES.**

No. 242.

Circuit Court of Appeals, Tenth Circuit.

Sept. 23, 1930.

Rehearing Denied Oct. 24, 1930.

874

F. A. Catron, of Santa Fe, N. M., for appellants.

George A. H. Fraser, Sp. Asst. to Atty. Gen., for the United States.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a suit brought by the United States, as guardian of the Indians of the Pueblo of Taos, under the provisions of the Pueblo Lands Act (43 Stat. 636 [25 USCA § 331 note]), to quiet the title to a portion of a tract of land in Taos County, New Mexico, known as the Tenorio Tract. The portion of such tract involved in this suit lies within the Antonio Martinez or Mapor Diego Lucero de Godoi Grant made in 1716, confirmed by the Court of Private Land Claims in 1891 and thereafter patented.

The whole of the Tenorio Tract also lies within the Antoine Leroux Grant, or Los Luceros Grant, made in 1742, and confirmed by an Act of Congress approved March 3, 1869.

The last two mentioned grants conflict, the latter being practically superimposed on the former.

A third grant of a tract of land, in the vicinity of the Rio Lucero, was made to Antonio Martin in 1745. It was never presented to the Court of Private Land Claims nor to Congress for confirmation, and its boundaries have not been determined except in so far as two decisions, hereinafter referred to, one by the alcalde (Justice of Peace) and one by the ayuntamiento (common council) of Taos, may have determined them.

In 1816, Manuel and Matias Martin, claiming by descent from their grandfather, Antonio Martin, filed a petition in the alcalde's court at Taos, seeking restitution of their share in the grant made to Antonio Martin at the Rinconada del Rio de Lucero.

The alcalde found that Antonio Martin had, by Isabel Pacheco, an illegitimate son, Diego Rafael Martin, then deceased, who was the father of petitioners; that Isabel Pacheco later married Francisco Sanchez; that there were four sons, Joaquin, Joseph, Francisco and Mariano Sanchez, the issue of such marriage; that Antonio Martin also had an illegitimate son by Francisca Pacheco, a sister of Isabel; that, by way of redress to the two sisters, he gave them a deed for a part of the Martin Grant, which deed was produced in court; that Francisca Pacheco died without heirs and the portion thus acquired by the two sisters passed to Isabel Pacheco Sanchez; that she died intestate and thereupon the title to such portion acquired by the two sisters passed to Manuel and Matias Martin, grandsons of Isabel Pacheco, and to the four Sanchezes, sons of Isabel Pacheco Sanchez. The alcalde, with the approval of the Spanish governor, entered a consent decree dividing the donated tract, giving half to Manuel and Matias Martin, and half to the Sanchezes, and making the Arroyo Seco the dividing line between the two portions and designating the other boundaries as "those which the grant recites."

On April 13, 1818, Miguel Tenorio, "as the attorney of the heirs of Diego Rafael Martin, the same being Manuel Martin and Matias Martin", for a consideration of $3,500, executed and delivered to the Pueblo of Taos a deed for a place called the "Rinconada de Rio Lucero." This deed also recites the authority of Tenorio; that the boundaries of the tract "are north, the Arroyo Seco; south, where the league that the King gives said Pueblo ends; east, by the foot of the mountains, and west by lands of the same grantees," and that Tenorio, as the attorney, "conveys and grants to the said pueblo, all the right, title and ownership that said heirs had to said tract, that they may enjoy it as their own, to their will by selling or alienating it to whomsoever they wish." The deed also contains a covenant of warranty.

In 1823 the question of water rights from the Rio de Lucero was in dispute between the Pueblo and the settlers of Arroyo Seco, then a Mexican village immediately north of the river of the same name. The governor referred such matter to the ayuntamiento of Taos for determination and in that year it handed down its decision by which it adjudicated such water rights to the Indians, with the exception of a surco of water (a measure of water for one man to irrigate with), which it gave to the settlers of the Arroyo Seco.

The Rio de Lucero is the east or southeast boundary of the Antonio Martinez Grant and also of the body of land here in dispute. The ayuntamiento found that the settlers of the Arroyo Seco were then located in a bend or nook between "the house of Lucero and the Arroyo Hondo," or, as elsewhere stated in the findings, between the "Arroyo Seco and the Arroyo Hondo";[1] that these settlers acquired title to their land under the Antonio Martin grant made in 1745 by Joaquin Codallo y Rabal, but made no use of the land until 1815, when they began to build houses and to cultivate the lands and to irrigate them from the Seco and Lucero; that the Indians were the sole owners of the water of the Rio de Lucero by immemorial use and, in addition, had obtained a new right under the deed from Tenorio, attorney-in-fact for the Martins; that the Tenorio deed conveyed the land from the league of the Pueblo to the Arroyo Seco; that the grantors in that deed were descendants of Antonio Martin, "who was the lawful owner of the land formerly granted"; and that the sale by the heirs of Antonio Martin extinguished, in favor of the Indians, any right of the Arroyo Seco people to the Tenorio tract.

In February, 1902, the suit of Manby et al. v. Martinez et al. was brought in the District Court of Taos County, in which it was sought to quiet title to and partition the Antonio Martinez Grant, above referred to. The Pueblo of Taos was a defendant. In 1916 a decree was entered quieting the title to the Tenorio Tract in Manby and others. The Pueblo appealed therefrom. On (June 14, 1918) a decree was entered in the Supreme Court of New Mexico which quieted title to the Tenorio Tract in the Pueblo. However, only one of the defendants to the instant suit was a defendant in that suit, and the record does not show that the other defendants in the instant suit were in privity with the defendants in that suit. The case is therefore only of historical significance here.

The Pueblo of Taos predicates its claim of title on the Tenorio deed and also on adverse possession under sections 3364 and 3365, New Mex. Stat. Ann. Code 1915 (sections 83—119 and 83—122, N. M. Stat. Ann., 1929 Comp.).

With reference to possession, the evidence in behalf of the plaintiff may be divided into two periods, namely, from 1818 to 1865 and

[1] The Hondo lies north and northwest of the Seco.

from 1865 to the time of the trial. Possession during the earlier period rested largely on tradition. Such tradition was to the effect that the Indians occupied and used the land south of the Arroyo Seco and the defendants and the settlers, through whom defendants claim, the land north of the Arroyo Seco. There were ruins of two Indian forts constructed on the Tenorio Tract south of the Arroyo Seco prior to 1865. It was the custom of the Indians to erect such forts for the purpose of protecting their grazing cattle against marauders.

In 1861, the Indians, asserting their ownership to the Tenorio Tract, actively opposed the approval of the Antoine Leroux Grant by the Surveyor General of New Mexico. This opposition was withdrawn upon receipt of a deed to that tract from the attorney-in-fact of the proponents of the grant.

Commencing with the year 1865, the Indians occupied the Tenorio Tract, cultivating and irrigating a portion thereof and using the remainder for grazing their cattle. About the year 1868, the governor of the Pueblo divided that portion of the tract lying between the Arroyo Seco and the Rio Lucero into strips for the purpose of cultivation, and allotted such strips to individual Indians, who marked the boundaries with piles of rocks. The remainder of the tract was used by the Indians for grazing their cattle and they ejected from the Tenorio Tract trespassing cattle belonging to the settlers. Such strips of land were cultivated and irrigated from the Arroyo Seco and the Rio Lucero by the Indians from 1868 down to the time the Manby suit was instituted. When that suit was commenced, the attorneys for the Indians advised them not to use the land in dispute until that suit was finally determined. The Indians, however, continued to use the land for grazing purposes and undertook to stop the use of the land by the defendants and their predecessors by peaceful protest. Under a permit of the governor of the Pueblo, the first settler's house was built about 1888 by Francisco Martinez, south of the river. Prior to the commencement of the Manby suit, there was no cultivation of any part of the disputed lands by the settlers, except upon tracts which they leased from the Indians. The defendants first began using the land in question, under claim of right, after the decision of the District Court of Taos County in the Manby suit. The first houses built by the defendants south of the Arroyo Seco was long after the commencement of the Manby suit and was not earlier than 1912.

The defendants claimed as the successors in title of the heirs of Antonio Martinez and by adverse possession, under color of title, from January 6, 1902. The defendants introduced in evidence a deed made on April 5, 1888, purporting to run from the heirs of Antonio Martinez to certain named grantees. This deed recited that the grantees were settlers upon and claimants of a portion of the Antonio Martinez Grant. They also introduced a power-of-attorney, dated February 1, 1896, purporting to be signed by claimants of the Antonio Martinez Grant, authorizing Antonio T. Gallegos and Juan Geronimo Martinez, as their attorneys-in-fact, to make partition among them of such grant. They also introduced deeds, purporting to have been made pursuant to such power-of-attorney, to them or their predecessors in title, to the portions of the Tenorio Tract now claimed by them. They also offered evidence of possession to establish their claims under section 4(a) of the Pueblo Lands Act (25 US CA § 331 note). This evidence failed to establish any adverse possession until about the year 1914.

The original complaint alleged the Martinez Grant and the Tenorio deed, and further alleged "that at all times from April 13, 1818, to the present time, said Pueblo of Taos has been and now is the owner in fee simple of said Tenorio Tract, * * * with title and color of title, as aforesaid, and in open, notorious, actual, exclusive, continuous and adverse possession of the same; and during the whole of said period has been exempted and entitled to be exempted from payment of any taxes thereon."

After the completion of the evidence, the plaintiff amended the complaint by setting up specifically a plea of title under sections 3364 and 3365, supra, and under section 4(a) of the Pueblo Lands Act.

The trial court found that on April 13, 1818, Manuel and Matias Martin were the owners, in fee simple, of the Tenorio Tract, and that on such date, by Miguel Tenorio, as their attorney-in-fact, they conveyed such tract to the Pueblo of Taos for a valuable consideration; that such deed was a good and valid conveyance; that the Pueblo of Taos acquired and obtained thereby a fee simple title to the Tenorio Tract; and that such title has not at any time been conveyed, forfeited or lost by the Pueblo. The court further found that the Pueblo of Taos had acquired a fee simple title under the provisions of section 3364, supra, and that the defendants had failed to establish adverse posses-

sion of such grant or any part thereof within the requirements of the Pueblo Lands Act. The court entered its decree quieting title in the Pueblo of Taos.

From this decree, certain of the defendants have appealed.

Counsel for the defendants contend that the plaintiff failed to establish a fee simple title to the Tenorio Tract by virtue of a valid Spanish Grant and through deeds of conveyance by the heirs of the grantee.

Manuel and Matias Martin claimed title to the Tenorio Tract as the heirs of Antonio Martin, the original grantee in the grant of 1745. This grant, so far as the Tenorio Tract is concerned, clearly conflicted with the prior Antonio Martinez Grant. The Antonio Martin Grant, by express terms, provided that it should be without prejudice to third parties, who had a prior right thereto. The proof failed to establish forfeiture of such Antonio Martinez Grant. Plaintiff, therefore, failed to establish a title from the Kingdom of Spain.

Counsel for the defendants further contend that the original complaint failed to plead, and the proof failed to establish a title under and by virtue of sections 3364 and 3365, supra; that the court erred in permitting the amendment which specifically pleaded title under these statutes; and that the benefits of such statutes were not available either to the government or the Indians.

Counsel for the defendants assert that the court erred in permitting the amendment, above referred to, on the ground that it deprived the defendants of an opportunity to cross-examine plaintiff's witnesses upon the issues made by such amendment, and that it introduced a new cause of action. Such amendment did not set up a new cause of action. The most that can be said is that it set up a new ground for the same cause of action. United States v. Cal. & Ore. L. Co., 192 U. S. 355, 24 S. Ct. 266, 48 L. Ed. 476; Baltimore S. S. Co. v. Phillips, 274 U. S. 316, 47 S. Ct. 600, 71 L. Ed. 1069. The original pleadings were sufficient to admit proof of adverse possession under the New Mexico statutes. It is apparent that counsel for the defendants knew that plaintiff was so claiming under the original complaint, because, in their demurrer to plaintiff's case in chief, the defendants set up, as a ground therefor, that the plaintiff had "failed to prove actual, exclusive, continuous, open, hostile and adverse possession" within the meaning of the statutes of limitation of New Mexico, as defined by the Supreme Court of that state. If

the defendants desired to further cross-examine plaintiff's witnesses or offer additional proof after this amendment was tendered, they could have asked the court to reopen the case for that purpose. This they failed to do. We conclude that the defendants were not prejudiced by this amendment, which pleaded specifically only what had previously been pleaded in general terms.

■ Counsel for the defendants assert that the Tenorio deed does not purport to convey an estate in fee simple. This argument is refuted by the plain language of the deed itself. It purports to convey an estate of inheritance, without restriction or condition, and it contains warranties of title. It is the Spanish equivalent of our warranty deed.

■ Counsel for the defendants further assert that the evidence did not establish that the Pueblo of Taos had and maintained continuous, actual, open, notorious, exclusive and adverse possession of such Tenorio Tract from 1870 until 1902. There can be no doubt that the proof established actual possession of that portion of the Tenorio Tract, which was cultivated and irrigated between those dates. In construing section 3364, supra, the Territorial Supreme Court held, in Montoya v. Unknown Heirs of Vigil, 16 N. M. 349, 120 P. 676, that possession of any part of the tract described in the deed, devise, grant or other assurance, purporting to convey an estate in fee simple, would be presumed to extend by construction to the limits of the land described in the deed or other assurance. This decision was affirmed by the Supreme Court of the United States in 232 U. S. 375, 34 S. Ct. 413, 414, 58 L. Ed. 645, where the court said:

"The interveners claim such strips, most of them but a few yards wide, but extending, as they say, from the Rio Grande westward to the Ceja or ridge of Rio Puerco,— a distance of some 16 miles. They had no documentary evidence of a title derived from Juan Gonzales, but they and their predecessors in title have occupied the bottom lands between the Rio Grande and the foothills to the west for more than ten years under deeds purporting to convey a fee simple in the respective strips to the ridge of Rio Puerco. The eastern part has been fenced, cultivated, and built upon; but from the foothills to the Ceja of Rio Puerco the land is unfenced, and by a general custom has been used mainly for the grazing of cattle by the interveners and others claiming ownership in the grant. The title to this last-mentioned land alone is in question now, and it will be seen that if the interveners have the title they claim, it must have been gained by the lapse of time during which they have held what they have held under the above-mentioned deeds. The judgment was in their favor in the courts below. 16 N. M. 349, 120 P. 676.

"The title of the interveners does not depend upon the ordinary statute of limitations, and some considerations that might be relevant under that statute are not relevant here. The title rests upon a peculiar statute that has been in force unchanged in any particular affecting this case, it is said, since 1858. Comp. Laws 1865, chap. 73, § 1, Comp. Laws 1897 § 2937. By this act, possession for ten years, under a deed purporting to convey a fee simple, of any lands which have been granted by Spain, Mexico, or the United States, gives a title in fee to the quantity of land specified in the deed, if, during the ten years, no claim by suit in law or equity, effectually prosecuted, shall have been set up. We state the statute according to its construction by the court below, with which, again we should be slow to interfere (Gray v. Taylor, 227 U. S. 51, 57, 33 S. Ct. 199, 57 L. Ed. 413, 416), and which also seems plainly right. * * *

"As applied to the interveners, the statute simply enacts that possession for ten years of the front and cultivable portion of a strip under a deed carrying the whole of it back to the ridge of the Puerco shall give title to the whole."

In this respect, section 3364 differs substantially from section 3365, which was originally a limitation statute not requiring color of title but became an adverse possession statute by amendments adopted in 1899 and 1905. See discussion of this statute in Montoya v. Unknown Heirs, etc., 16 N. M. 349, 120 P. at page 689, 690.

It follows that if the Pueblo of Taos is entitled to the benefit of section 3364, supra, then it acquired a fee simple title to the whole of the Tenorio Tract prior to 1902 by virtue of the Tenorio deed and the adverse possession of the cultivated portions of the land described therein; and that it will be unnecessary to determine whether plaintiff made out a case under section 3365, supra.

■ Counsel for the defendants further assert that, under the provisions of section 5 of the Pueblo Lands Act (25 USCA § 331 note), Congress took away the right of the government or the Pueblo to plead a title under either section 3364, supra, or section 3365, supra. A statute of limitation may be pleaded for the benefit of the United States al-

though it is not expressly named in such statute and although its prerogative of sovereignty would protect it from the use of such plea against it. United States v. Sligh (C. C. A. 9) 24 F.(2d) 636, 637; Stanley v. Schwalby, 147 U. S. 508, 13 S. Ct. 418, 37 L. Ed. 259, 37 C. J. 714.

 The right of an Indian Pueblo to acquire title by adverse possession was recognized in United States v. Chavez, 175 U. S. 509, 515-516, 523-524, 20 S. Ct. 159, 44 L. Ed. 255. By the Act of December, 1847, Rev. St. N. M. 1855, p. 420, section 69—101, N. M. Stat. Ann., Comp. 1929, the Indian Pueblos were given the status of bodies politic and corporate and, as such, empowered to sue in respect of their lands. Lane v. Pueblo of Santa Rosa, 249 U. S. 110, 39 S. Ct. 185, 63 L. Ed. 504. A statute of limitation, in the absence of provision therein to the contrary, runs not only for, but against municipal or public corporations. Metropolitan R. Co. v. Dist. of Columbia, 132 U. S. 1, 11-12, 10 S. Ct. 19, 33 L. Ed. 231; Little v. Emmett Irr. Dist., 45 Idaho, 485, 263 P. 40, 56 A. L. R. 822; Rosedale S. D. No. 5 v. Towner County, 56 N. D. 41, 216 N. W. 212, 215. We conclude that such Indian Pueblos were entitled to the benefits of the New Mexico statutes of limitation and that the United States, as their guardian, may plead such statutes in their behalf.

If this be true, then the Pueblo of Taos, having acquired a fee simple title to the Tenorio Tract under section 3364, supra, prior to the adoption of the Pueblo Lands Act, could not be deprived of that title by legislative fiat.

It was settled, by the decision in United States v. Candelaria, 271 U. S. 432, 46 S. Ct. 561, 70 L. Ed. 1023, that the Pueblo Indians are under the guardianship of the United States, and that they are within the Non-Intercourse Act (Act June 30, 1834, 4 Stat. 730; Act Feb. 27, 1851, 9 Stat. 587), and that title, once vested in the Pueblos, could not be divested without the consent of the United States. It follows, therefore, that the statutes of limitation in New Mexico could not be pleaded against the Pueblo Indians without the consent of the United States. The Pueblo Lands Act was an act of grace. It gave the right to the claimants of Indian lands to plead limitation, as defined therein, and, by so doing, it impliedly excluded the right to plead the New Mexico statutes. This construction, however, does not apply to the provisions of the Pueblo Lands Act giving the Pueblo Indians the right to plead limitations, as defined therein, because, prior to the adoption of the Pueblo Lands Act, the Pueblo Indians or the government in their behalf could plead a title acquired under sections 3364 and 3365, supra, and the mere addition of the right to plead limitation, as defined in the act, would not take away the existing right to plead a title under the New Mexico statutes.

Finally, counsel for the defendants contend that they established title under the provisions of section 4(a) of the Pueblo Lands Act. The defendants did not bring themselves within this section because they wholly failed to show any possession on their part until long after January 6, 1902, the beginning of the limitation period fixed in such section.

It is our conclusion that, under Section 3364, supra, plaintiff established title to the Tenorio Tract in the Pueblo of Taos, and, for that reason, the decree is affirmed.